~~David L~~Riza I. ~~Cook~~Dagli, Esq.
~~SILLS CUMMIS & GROSS P.C.~~
~~One Riverfront Plaza~~
~~Newark~~
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, New Jersey ~~07102~~07068
~~Tel~~Ph.: (973) ~~643-7000~~403-3103
Fax: (973) ~~643-6500~~618-5503
~~dcook@sillscummis.com~~
rdagli@bracheichler.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ~~USI International Inc.,~~ | ~~Civil Action No.: 3:15-cv-08451 (MAS)(TJB)~~ |
| ~~v.~~USI INTERNATIONAL INC., | |
| Plaintiff, | Civil Action No. 3:15-CV-08451-MAS-TJB |
| v. | |
| FESTO DIDACTIC INC., | **SECOND** AMENDED COMPLAINT |
| ~~Festo Didactic Inc~~Defendant. | |

Plaintiff USI International Inc. ("USI"), by way of Complaint against Defendant Festo Didactic Inc. ~~("Festo"~~, formerly known as Lab-Volt Systems, Inc. ("Lab-Volt"), (hereinafter referred to collectively as either Festo or Lab-Volt for clarity, depending upon whether the events alleged occurred before or after the acquisition and name change), alleges as follows with respect to itself and its own actions, and upon information and belief as to all other matters:

**THE PARTIES**

1.     Plaintiff USI is an Icaza Belize Trust corporation with an address at 60 Market Square, PO Box 364, Belize City, Belize.

2.      Upon information and belief, ~~defendant~~Defendant, Festo is a New Jersey corporation with an address at 607 Industrial Way West, Eatontown, New Jersey 07724.

**<u>INTRODUCTION</u>**

3.      This action arises from Festo's refusal to honor a contractual obligation to pay USI ~~its fee~~millions of dollars in ~~the amount of at least $2,774,840.25~~compensation owed to it. In April of 2012, USI entered into an

exclusive agreement ("agreement") with Lab-Volt ~~Systems, Inc. ("Lab-Volt")~~ to facilitate the sale of Lab-Volt electronic training equipment through the United States ~~government for~~Government ("Government") to the ~~government~~Government of Oman ("Oman"). ~~The~~Consistent with their prior dealings and with the custom and practice of the parties, the agreement ~~provided~~contemplated that ~~USI would receive 25% of~~ Lab-Volt~~'s total contract price for its services if the equipment was purchased at full~~ would sell its products to customers secured through USI's services in consideration for 75% of Lab-Volt~~'s regular~~ list ~~price. As per numerous prior dealings between USI and~~price (e.g., at Lab-Volt~~'s~~ "net selling price"), that USI ~~would realize 100% of any additional mark-up in the final contract~~could set the final selling price to the buyer, and that USI could retain that portion of the actual sales price which exceeded the Lab-Volt "net selling price. "

4. In or about June 2014, ~~defendant~~Festo ~~acquired Lab-Volt. Thereafter, on~~AG & Co. KG ("Festo AG"), which is a large German company based in Esslingen, Germany, acting through one of its subsidiaries or affiliates, acquired Lab-Volt and renamed it Festo Didactic, Inc., the defendant herein which is obligated to pay USI pursuant to the Agreement. Lab-Volt (before the name change) and Festo (after the name change) confirmed to USI that Festo was aware of, and fully committed to, honoring the agreement with USI.

5. On October 10, 2014, the deal originated by USI closed, and Festo was awarded ~~an~~a contract that was valued at $11,099,361 ~~contract~~ to sell equipment through the United States ~~government to the government of~~Government to Oman.

6. Upon information and belief, the scope and price of the sales transaction has or will increase since that date due to the purchase or anticipated purchase of additional products and services in connection with the same transaction.

7.     From approximately 2018 through 2020, additional products and services in connection with the same transaction have been sold and/or offered by Festo to the MTC, including, but not limited to, extended warranty, calibration and training.

8.     In addition to the approximately $11 million of the initial transaction, USI is entitled to payment from Festo on the additional products and services in connection with the same transaction, due to nature of the exclusivity provided for under the agreement.

9.     Upon information and belief, the expected completion date of the initial transaction with June 30, 2020, however the completion date of the additional products and services has not been determined.

10.   4. Despite repeated assurances by Lab-Volt that it would honor its agreement, and that Festo was aware of Lab-Volt's commitment this Agreement with USI, Festo has ignored USI' s requests for payment and is in breach of the agreement with USI.

## JURISDICTION

11.   5. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2), because the Plaintiff and the Defendant are a citizen of a state and a citizen of a foreign state. Further, the amount in controversy exceeds several million dollars and thus is well- above the statutory minimum.

12.   6. Venue as to Defendant is proper in this judicial district because Defendant Festo is headquartered and has its principle place of business in Eatontown, New Jersey, and some of the acts complained of occurred in this judicial district.

## FACTUAL ALLEGATIONS

13.    ~~7.~~ This matter arises from an ~~agreement~~<u>exclusive Agreement</u> between Lab-Volt and USI under which USI would be compensated for having introduced and brokered a deal for the sale of goods by Lab-Volt with the Military Technical College of Oman ("MTCO").

14.     8. In late March 2012, USI learned of an expiring opportunity to sell various electronics training equipment to MTCO through funding allocated to the ~~government~~Government of Oman through an offset program with the United States ~~government~~Government.

15.     The MTCO was a top priority of the Government of Oman.

16.     USI was asked by the MTCO to identify manufacturers, particularly in the U.S., who could provide technical training equipment. The timeframe to complete this task was incredibly short as the availability of the funding for the MTCO was subject to a financing facility that was set to expire within a matter of days.

17.     Upon information and belief, failure to complete the work of identifying the supplier, equipment, and preparing the initial offer in time would have resulted in the forfeiture of the funding.

18.     Upon information and belief, Oman is a strategic partner in the region and the failure to meet the deadline could have been potentially damaging to the relationship between the United States Government and Oman.

19.     9. USI ~~brought this~~identified Lab-Volt as a potential supplier and presented the opportunity to Jeremy Duggan, a senior executive with Lab-Volt~~, who~~.

20.     Lab-Volt expressed immediate interest in the opportunity and agreed to cooperate with USI on an exclusive basis.

21.     On April 3, 2012, USI provided MTCO with information about Lab-Volt's products.

22.     MTCO reviewed the Lab-Volt products and responded to USI on April 4, 2012 with a list of equipment and sought additional advice and pricing information from USI about the products. The deadline for USI to respond to MTCO was on Saturday, April 7, 2012.

23.     The following day, USI confirmed receipt of the equipment list and assured MTCO that there would be no problem with meeting the deadline.

24.     On April 5, 2012, USI sent MTCO's list of selected equipment to Lab-Volt. In response, Lab-Volt sought USI's assistance in seeking clarification from MTCO regarding the equipment list.

25.     Subsequently, Lab-Volt sent USI its firm fixed price offer for the equipment. The net selling price confirmed by Lab-Volt to USI was set at 75% of its published list price *(i.e.,* Lab-Volt's published list price less a 25% discount). USI was then free, in turn, to quote a final price to MTCO at or above the net selling price quoted to USI, with the understanding that the difference between Lab-Volt's net selling price and USI's quoted price to MTCO would be USI's compensation for the transaction.

26.     ~~10.~~ On or about April 6, 2012, USI, ~~after selecting Lab-Volt, submitted an~~ prepared and delivered the initial offer, with terms and conditions, to MTCO including approximately $9.3 million dollars of Lab-Volt goods and services.

~~11.     USI's offer to~~ The price given by USI for MTCO ~~was based on documentation from Lab-Volt showing list pricing to USI~~, which included ~~a 25% commission for USI~~Lab-Volt's standard one-year warranty term, was unilaterally determined by USI, and therefore it fixed the amount of USI's compensation or profit.

27.     The breakdown of the ~~$9.3 million dollars included~~ approximately $~~5.6~~9.3 million dollar price quoted to MTCO was based upon approximately $5.6 million representing Lab-Volt's net selling price, ~~an additional $1.8 million representing USI's 25% commission (if Lab-Volt received its final selling price of $5.6 million)~~ given to USI, and an additional ~~25% USI mark-up of approximately $1.9~~$3.7 million ~~(totaling approximately $9.3 million). The additional mark-up was~~

~~to be paid 100% to USI. Both the 25% commission and additional mark-up were "baked" into the final price offered to MTCO~~ to compensate USI for selecting Lab-Volt equipment and putting the transaction together in such a short timeframe.

28.     On April 6, 2012, USI informed Lab-Volt that it had met the deadline for the delivery of its offer to MTCO.

29.     On April 7, 2012, MTCO acknowledged receipt of USI's offer for the Lab-Volt equipment and asked USI some clarifying questions relating to commercial terms.

30.     ~~12.~~ On ~~or about~~10 April 10, 2012, USI and Lab-Volt executed a Letter of Commitment, which confirmed ~~in a letter agreement~~ that ~~it had agreed to~~Lab-Volt would work ~~exclusively~~ with USI ~~on its efforts to sell equipment to MTCO, and that it had agreed to pay USI 25% if the goods offered in the April 9 submission were purchased at Lab-Volt's full list price:~~ ~~"This letter is to confirm that Lab-Volt is working exclusively with USI International, Inc. exclusively on the current~~exclusively on the Oman Military Technical College ~~offset funding direct purchase~~ project. ~~Under the terms~~As part of the ~~funding we expect~~agreement between Lab-Volt and USI, Lab-Volt confirmed that its net selling price on any sales to MTCO would be at 75% of its list prices, thereby guaranteeing USI that it would receive compensation that was no less than 25% of the list prices on any sales at list price. To memorialize this, the Letter of Commitment provided that in the event of a "direct order to Lab-Volt without a tender~~, and therefore Lab-Volt will pay the full agent's commission of 25% to USI International Inc. if~~" where the equipment ~~is~~was purchased at full Lab-Volt ~~List Price~~list price, Lab-Volt would pay USI a commission of 25%."

3

~~13.     The Lab-Volt list price thus included allowance for the payment of a 25% commission to USI. As stated, any additional mark-up by USI would be paid 100% to USI.~~

31.     The understanding between the parties was that Lab-Volt would be assured of receiving 75% of its published list price as its net selling price. USI's compensation would be the difference between the net selling price by Lab-Volt and whatever actual sales price USI could obtain from MTCO. In short, Lab-Volt was assured that it would receive its net selling price on any sale to MTCO. The rest was up to USI. Thus, USI bore the risk of its compensation being less than 25% if the ultimate MTCO sales price was less than Lab-Volt's list prices, but it also had the opportunity for compensation over 25% of the list price if it persuaded MTCO to pay a sales price that was above Lab-Volt's list price. Either way, Lab-Volt would get its net selling price.

32.     USI undertook an active and critical role in ensuring that MTCO was able to fully realize the benefit of the financing facility through a sale without a tender *(i.e.,* a sale without competitive bidding) prior to the expiration of that financing.

33.     As referenced above, USI's role was instrumental in ensuring that the United States Government and Oman could realize the benefit of the financing arrangement. USI's role was also instrumental in ensuring that Lab-Volt got the benefit of this opportunity. But for USI's efforts in timely sourcing, pricing, and structuring the transaction, Lab-Volt would never have been able to secure an order of this magnitude.

34.     Even after the offer was provided and accepted by MTCO, MTCO continued to rely upon USI to find additional items and identify an alternate supplier in case USI's first choice (Lab-Volt) was not accepted by the United States Government as a suitable vendor.

35.     On or about 13 April 2012, MTCO submitted the offer to purchase items from Lab-Volt to the United States Government before the financing facility expired. As a result, everyone was pleased. Therefore, that night, USI hosted a celebratory dinner for MTCO and Lab-Volt.

36.     ~~14.~~ Shortly after the delivery by Lab-Volt of the Letter ~~Agreement~~of Commitment, USI and Lab-Volt learned that the purchases would be made through the United States government's Foreign Military Sales ("FMS") program. As a result, the sale would technically be made by Lab-Volt to the United States ~~government~~Government, and the United States would then provide the ~~goods sold~~Lab-Volt equipment to MTCO. The ~~goods~~equipment to be sold ~~remained~~through the United State Government to MTCO was precisely the same ~~goods~~equipment identified in the offer made by USI and at the selling prices unilaterally established by USI.

37.     Within days thereafter, on or about 16 April 2012, MTCO informed USI that the proposal looked very positive, and that Lab-Volt should expect a call from the U.S. Embassy in Oman. USI relayed the message to Lab-Volt.

38.     On 17 April 2012, Colonel Hoffman called Lab-Volt directly and followed up with an email, which informed Lab-Volt that "Oman is building a technical college and wants to equip it with Lab-Volt equipment. ... I have attached the spreadsheet for it. ... As you can see the equipment is about $9 million." The spreadsheet that Colonel Hoffman sent to Lab-Volt was the spreadsheet that USI had prepared and provided to MTCO on 6 April 2012 and reflected USI's quoted selling prices, which were well above the Lab-Volt's list prices. Significantly, upon information and belief, this was the first time that Lab-Volt recognized that USI had obtained MTCO's agreement to sales prices that were well above the Lab-Volt list prices, thereby generating substantial compensation for USI.

39.    Realizing that USI had procured a sale to MTCO through the United States Government well above Lab-Volt list prices, Mr. Duggan and Lab-Volt set about a scheme to deceive USI and to retain USI's compensation for themselves.

40.    ~~15.~~ On the very next day, Lab-Volt began to dissemble. On or about April 18, 2012, Lab-Volt, through an email from Mr. Duggan, advised USI that the ~~transaction had to be pursued through an~~ FMS transaction~~, but that Lab-Volt was able to participate in that program because Lab-Volt was a "US Company". Although Duggan advised that under FMS transactions,~~ commissions had to be authorized by the end buyer (_i.e.,_ the government of Oman). Duggan stated that he expected that Lab-Volt would be able to ~~pay commission to USI. He also advised that the deal might take two years to finalize because of the involvement of the U.S. government. However, Duggan indicated, in effect, that the additional~~ compensate USI, but that any compensation to USI above 25% ~~markup (beyond~~ of the ~~commission)~~ list prices could not be charged and that the final contract price would be "drastically" reduced (e.g., to the Lab-Volt list prices). Because of this, USI was under the impression that it would receive ~~a straight~~ compensation of only 25% ~~commission from~~ of the final list price contract ~~price~~. Mr. Duggan also advised USI that the sale would take approximately 2 years to finalize.

41.    ~~16.~~ On April 20, 2012, Mr. Duggan emailed USI again. Confirming that the deal was to be completed through the FMS program, Duggan reiterated that Lab-Volt would honor its obligation to pay USI a fee for the services that it had provided in both finding ~~that~~ the buyer ~~and,~~ structuring the transaction, as well as preparing and providing the initial offer to MTCO.

42.    ~~17.~~ Upon receiving confirmation that Lab-Volt intended to honor its obligation to USI, USI continued to support Lab-Volt in pursuing the transaction.

4

18.     On or about June 19, 2012, well after the parties understood this would be an FMS deal, USI received confirmation that the prices Lab-Volt had quoted to the federal government were Lab-Volt's list prices previously provided to USI in April. Those prices continued to include a 25% commission for USI, including for a few items added to the transaction after USI's initial April offer.

19.     By email from Mr. Duggan dated June 19, 2012, Lab-Volt provided a pro-forma to USI.

**Lab Volt Undertakes to Defraud USI of its Rightful Compensation**

43.     After using USI to secure a contract nearly 400 times higher than any of its previous business with the United States Government, Lab-Volt implemented the scheme to steal USI's expected profit from the sale to MTCO.

44.     The first step of the scheme was to deceive USI about the actual sales price. Immediately after his contact with Colonel Hoffman, on April 18, 2012 Lab-Volt informed USI that the Government had insisted that the prices needed to be reduced. This representation was a lie. The Government had made no such demand, and Lab-Volt invented the false story as a means to cheat USI and keep USI's profits for itself.

45.     20. In the pro-forma attached to Mr. Duggan's June 19, 2012 email, the asking prices did not include the additional mark-up To support its lie, Lab-Volt then prepared a fake Pro-forma invoice (PF 214060, dated June 6, 2012, for customer: NAWCTSD International) on June 19, 2012 and sent it to USI. This fake Pro-forma invoice falsely indicated that the actual sales price for the MTCO transaction was going to be at Lab-Volt's list prices. Such a sale would effectively eliminate USI's profit, measured by the portion of the original USI sales price which exceeded Lab-Volt's published list prices. Lab-Volt falsely represented to USI that this proPro-forma accurately

reflected the ~~deal~~sale being pursued in the FMS transaction. This was the first of two false invoices that USI received from Lab-Volt.

46. ~~21.~~USI relied on ~~this representation~~Lab-Volt's misrepresentation that it had reduced the prices when concluding ~~that~~ it would only be entitled to a ~~straight~~profit of 25% ~~commission~~of a sale at list prices.

47. ~~22.~~Lab-Volt reiterated that it would pay ~~this~~ "commission" to USI on the entire list of included products, excluding commission only on training, installation, and shipping, which were being priced at Lab-Volt's actual cost.

48. After filing the original Complaint in this action, USI learned that Lab-Volt never reduced the prices as it had represented to USI.

49. In truth and in fact, Lab-Volt continued to charge the United States Government the very prices that USI had unilaterally established and for which USI had obtained MTCO's agreement. Indeed, Lab-Volt went so far as internally comparing the fake reduced Pro-forma invoice given to deceive USI with the actual version of the Pro-forma invoice given to the United States Government.

50. ~~23. Subsequent to the filing of the original complaint in this action, USI ascertained, in or about July 2017, through a document exchange during discovery, that Lab-Volt may have actually charged the federal government in the FMS transaction additional mark-ups together with the 25% commission.~~ In other words, Lab-Volt quoted the government ~~similar~~asking prices ~~to~~in line with those that were ~~utilized~~unilaterally established by USI when it presented the ~~deal~~transaction to MTCO originally. By doing this, Lab-Volt misrepresented to USI that it would only be entitled to a ~~25% commission on the $11,099,361 price as opposed to receiving 100% of an approximate fee of $2 million dollar carve out of the final contract price attributable to the~~

~~additional USI mark-up~~<u>smaller payment rather than compensation equal to the portion of the sales price above Lab-Volt's net selling price</u>.

~~5~~

51.     In addition, in order to further disguise its efforts to defraud USI, in May 2012, Lab-Volt purportedly brought a third party strawman, Westfield International ("Westfield"), into the deal. Westfield had played no role in securing the MTCO order of Lab-Volt equipment and any introduction of Westfield was a clear violation of the exclusivity granted by Lab-Volt to USI. When USI strongly resisted the introduction of a third party to the situation as it violated the exclusivity agreement, Lab-Volt assured USI that it would remove Westfield from the project, but it did not.

52.     In an effort to conceal the fact that Lab-Volt was stealing a portion of USI's profit for itself, on September 1, 2012 (more than five months after USI's prices had been given to and accepted by MTCO), Lab-Volt entered into a "fake" service agreement with Westfield. The Westfield service agreement refers to the same Pro-forma number (PF21460) that was sent to USI in an altered version, and referred specifically to the Military Technical College of Oman (MTCO) US NAWCTSD International program, which was a project that was exclusive to USI. The fake service agreement purported to assign 20% of the actual selling price (which was the portion of the USI profit that Lab-Volt wanted to steal for itself) to Westfield for purported on-site services to MTCO - - which were largely non-existent. This scheme is confirmed by internal Lab-Volt documents comparing the fake invoice submitted to USI and the real invoice submitted to the Government.

53.     Lab-Volt continued to string USI along into believing that the sale transactions (at the lower net sales price) was proceeding at a slow pace and that USI would eventually be paid.

54.     ~~24.~~ In July 2012, Mr. Duggan of Lab-Volt further updated USI on the progress of the deal, forwarding Lab-Volt's communications with its federal government contact, Colonel Robert Hoffman to USI.

55.   ~~25.~~ Lab-Volt continued to provide updates on the progress of the transaction, and reiterated its obligation to pay a fee to USI on multiple occasions. For instance, on October 9, 2012, Mr. Duggan updated USI on the progress of the deal. Duggan advised that Lab-Volt had hired a new executive, Dan Rodriguez, and confirmed that "both Dan and Peter are fully aware of the commitment to you to pay the consulting contract we discussed." Additional communications concerning the progress of the transaction were exchanged between USI and Lab-Volt in 2013 and early 2014.

56.   ~~26.~~ In May 2014, USI became aware that Lab-Volt was in the process of being acquired by Festo Didactic, Inc. After demanding, and receiving, verbal assurances from Lab-Volt that Lab-Volt and Festo would honor the contract, USI demanded confirmation in writing in emails dated May 22 and May 27, 2014 that ~~both~~ Lab-Volt and Festo would honor ~~their~~the commitment to pay USI the fee as agreed in the April 10, 2012 letter. <u>On May 23, 2014, Peter Schluter, President of Lab-Volt, sent correspondence to Mr. Daniel Boese, Senior Vice President and Managing Director of Festo, confirming the April 10, 2012 commitment to pay USI in relation to the MTCO project.</u> On May 28, 2014, Mr. Duggan emailed USI and stated: "In response to your emails of May 22 and May 27 - As you know Lab-Volt recognizes my letter of April 10, 2012 as a commitment to USI International in regard to the Oman project. In addition I confirm that Festo has been informed of this commitment." Mr. Duggan ~~forwarded~~sent this email as the Senior Vice President of International Sales & Marketing for Lab-Volt Systems, Inc.

57.   ~~27.~~ At all times throughout this process, Lab-Volt never denied or disputed that it was obligated to ~~pay commission to~~compensate USI for its services in originating and assisting with the transaction.

6

58.    In or about June 19, 2014, the United States Government issued its formal RFP to Lab-volt for the equipment for the MTCO.

59.    ~~28.~~ Upon information and belief, ~~in~~on or about June 20, 2014, Festo acquired Lab-Volt.

60.    ~~29. Upon information and belief, Festo assumed all of Lab-Volt's liabilities in the acquisition.~~ Lab-Volt was renamed Festo Didactic, Inc. after the acquisition.

**While Trying to Cut USI Out of the Deal, Festo Deceives the United States Government**

61.    Festo's plan to deceive USI in order to retain the compensation that USI was owed under the agreement had one more step. Festo needed the Government to approve the prices that USI had originally and unilaterally established and which were well above Lab-Volt's list prices. In short, it needed some explanation to justify the higher prices and to hide the fact that Lab-Volt was now going to pocket an abnormally large profit.

62.    Lab-Volt knew that Federal law, including the FMS- Foreign Military Supplies procurement rules, Section N, and Part 31 of the Federal Acquisition Regulations (FAR) (allowable versus unallowable costs), specifically requires that an invoice to the Government disclose the detailed price breakdowns, including all fees, commissions, and profit margins

63.    The obligations are set forth in various documents relating to the project such as the Request for Proposal ("RFP"), the Letter of Request ("LOR"), the Letter of Offer and Acceptance ("LOA"), the Statement of Work ("SOW") and the Contract Award.

64.    Festo's obligation to follow these rules was clearly set forth in the RFP, LOR, LOA, SOW, and the Contract Award.

65.    In order to conceal its scheme to steal USI's share of the sales proceeds and to hide its expected large profit, Festo repeatedly and intentionally misled the Government with incorrect

price breakdowns and intentionally failed to disclose USI's role in the MTCO transaction, from which Lab-Volt originally only expected to receive its net selling price, and the fact that USI was entitled to receive compensation measured by the portion of the sales price that exceeded Festo's net selling price.

66.    On September 2, 2015, the Government sent the RFP based on USI's offer to Festo. According to the RFP and the Contract, Festo was obliged to disclose USI's compensation (contingent fees) to both Oman and the Government.

67.    On September 02, 2015, Jonathan Abbott, NAWCTSD Contract Specialist, wrote to Festo about Festo's responsibility to disclose commissions and fees that are a part of the contract price and included a link to the relevant FMS Procurement Rules.

68.    Not one of the Pro-forma Invoices submitted by Festo to the Government and MTCO declared any fees or commissions related to the sale. Not once did Festo truthfully disclose USI's role. By not declaring the fees or commissions that constitute 45% of the contract price, Festo deliberately made a fraudulent certification to the United States Government that the contract price did not include any fees. Festo, then, fraudulently collected on the falsely certified invoices.

69.    In addition to failing to make the requisite disclosures pursuant to the clauses/obligations arising under the RFP and the Contract as well as regulations such as the FAR and FMS Procurement Rules, Festo also failed to properly and candidly respond to direct questioning by the United States Government regarding the breakdown of the equipment prices and why those prices were higher than Festo's list prices.

70.    On multiple occasions Government representatives sought information from Festo as to what percentages of the selling prices represented the cost of the good, services, profits, sub-contracted items, and location of performance efforts associated with the contract.

71.     On July 28, 2014, the Government wrote to Festo to "provide the assumptions that come up to the totals to include, but not limited to, the effort (hours, labor mix, etc.)...provide supporting data which includes the basis for the proposed costs. The proposed costs shall be supported with historical sales, purchase history, vendor quotes, purchase orders, engineering estimates, etc. If there are any subcontracted items, please provide the basis for the price of those items."

72.     Mr. Duggan, who was responsible for the false certifications hiding undisclosed compensation, grew concerned that the Government was asking questions that might reveal the fraud. As a result, he contacted Westfield to help him respond. Westfield wrote back, "[T]his [is] not good ... I need to give it some thought."

73.     Festo, in desperate need of a way to defend its high prices to the Government, invented out of whole cloth the false explanation that the selling prices included the actual cost of a five-year additional warranty. Festo concealed the fact that the original selling prices set by USI, approved by MTCO, and which Festo continued to submit to the United States Government covered only a one-year warranty.

74.     In fact, the initial sales offer prepared by USI for MTCO showed only a one-year warranty and a subsequent sales offer at the same prices submitted directly by Festo to the United States Government (bearing the signature of Festo's executive, Mr. Duggan) also provided for only a one-year warranty.

75.     On August 13, 2014, the Government, through Mr. Abbott, again asked Festo to "lease provide a breakdown of the labor cost for installation and training to include labor categories, direct rates, indirect rates, and profit." Festo did not provide an exact breakdown of and did not declare the profit of approximately $8 million out of a proposed $11.1 million sales price.

76.    On September 11, 2014, the Government also asked Festo to explain the price difference in unit prices of the equipment. Festo continued the deception by falsely confirming to the Government that the original offer had been calculated with a five-year warranty, when in truth and in fact, it had not. The price difference that the Government was asking about represented USI's rightful compensation, which Festo wished to steal and hide from the Government.

77.    ~~30.~~ Upon information and belief, on or about October 10, 2014, the United States Naval Air Warfare Training System Division, Orlando, Florida awarded a formal contract to Festo for the sale of training devices to the government of Oman in the amount of $11,099,361 (the "Sale")~~. Despite repeated requests prior to this litigation, USI was not provided with a complete copy of the signed contract~~.

78.    ~~31.~~ Upon information and belief, the contract was awarded under the Foreign Military Sales Program, and included items initially offered to MTCO in USI's offer of April 6, 2012, as well as additional items which Lab-Volt had previously agreed were included in USI's exclusive agreement with Lab-Volt at the prices quoted in Lab-Volt's June 12, 2012 offer.

~~32.    Accordingly, Lab-Volt must have advised the federal government, and obtained written authorization from the government of Oman to charge a price that included a 25% commission to USI, as required for it to honor its obligations to USI, and to comply with federal regulations requiring pricing of FMS transactions without unauthorized commissions. In fact, it appears that the final contract price also included substantial additional mark-ups.~~

79.    Upon information and belief, additional amounts were thereafter awarded to Festo under the same financing facility for delivery of more training equipment to the MTCO, again likely based upon prices originally structured by USI. Thus, just months later, on or about May 21, 2015, Festo received another award for additional training equipment for MTCO in the amount of

$4,700,659.01, again as a firm, fixed price, sole source contract. The completion date of this contract is listed as June 30, 2020. This order, too, falls squarely within the ambit of USI's exclusive agreement with Festo regarding equipment for the MTCO. As a result, USI is entitled to compensation measured by the amount of the sale price on the May 21, 2015 award that exceeds 75% of Festo's list price for this equipment.

80.     Upon information and belief, the scope and price of this overall sales transaction for MTCO has now increased to well over $15 million and may continue to increase further.

81.     The Government relied upon Festo's fraudulent representations in making its incorrect Congressional Announcement because such fees were never disclosed to the Government.

**Festo Attempts to Manipulate the Contract and Defraud USI**

82.     Festo's lies and misrepresentations did not end when the contract was awarded. It was still receiving questions from the Government for which it needed answers. With the contract in place, Festo needed to find a way to cover its misrepresentation to the Government and simultaneously avoid paying USI.

83.     On March 5, 2015, Charles H. Gifford, International Training Systems Logistics, NAWCTSD, specifically questioned why he couldn't find any reference to the five-year warranty in the Letter of Acceptance: "I'm guessing Oman requested five year warranty but I can't find it in the LOA. Did Oman request something additional outside of the LOA? Festo should have a fairly standard warranty that covers their product." He further stated that if the 5 years warranty was requested than "What should have been reviewed during the evaluation of proposals and should have been part of their proposal." Festo falsely explained to the Government that the five-year warranty was bundled into the equipment prices. In order to carry on the charade, Festo also

represented to USI that there was an unwritten agreement between Festo and the Government - - for the 5-year warranty pricing (total 20%) as "increased pricing on the equipment!" Festo's lie triggered the change of terms and confusion - - an amendment to the LOA was made to match the lie of the five-year warranty. But, in truth and fact, the 5-year warranty had never been requested and no 5-year warranty term was included in the original offer. Nor would a 5-year warranty, amount to anything approaching increase in the purchase price over Festo's list prices.

84.     Once Festo embarked on a series of lies and misrepresentations, more were required. Festo wanted to keep the extra profit, not pay it out to Westfield for bogus services. Therefore and thereafter, Festo falsely represented to Westfield that Festo had disclosed the 20% Service Contract to Government, but instead the Government wanted less service and more products, and the Government opted for a 5-year warranty for only $479,000 USD. Therefore, the 4% per annum of total 5 years' service was no longer bundled in the prices.

85.     In short, Festo was compelled to deceive both USI and Westfield in its effort to steal the portion of the sales price increased by USI for itself: (a) Festo lied to Westfield that Festo had disclosed the 20% service contract to the Government; and (b) in correspondence dated November 13, 2015 to USI, Festo also lied to USI and asserted that Festo had disclosed USI's claim to the government. However, in truth, Festo never made any such disclosures to the Government.

86.     Festo, then, deliberately tried to manipulate the terms of the sale in order to avoid paying USI's fees.

87.     The payment of USI's compensation was conditioned upon Festo receiving an order without a tender (i.e., Festo would not have to engage in a competitive bidding process). Festo's expectation when it entered into the agreement with USI was to receive a direct order to Lab Volt. This expectation was realized as Festo was designated as a "sole source prime contractor for the

training equipment for the Military Technical College ..." and never had to compete with other bidders for the project.

88.    On September 23, 2014, Festo wrote to the Government and tried to suggest that: "Festo would much prefer that this [order] had been [as a result of] a tender." ... "Can this [order] be changed to a tender?" This suggestion was made in order to evade its obligation to pay USI because under the terms of the Letter of Commitment signed by Festo to USI, payment to USI was conditioned upon an order without a tender (i.e., without a competitive bidding process). This ruse by Festo also proved to be unsuccessful as the Government did not yield to Festo's requests to change the order from a sole source contract to a tender.

89.    Knowing that it had intentionally deceived the Government by failing to disclose USI's role in the transaction and its entitlement to a substantial portion of the purchase price, Festo then sought a general endorsement (in the form of an official letter) from the Government that Festo was in full compliance with the FMS regulations and Government Procurement Conditions. Festo asked: "Could we please get an official letter from FMS or equivalent stating that by accepting the award without a tender Festo is in full compliance with the FMS and governmental procurement conditions for this project."). This ploy failed as well.

90.    Festo then tried to turn its own violation of the Federal Acquisition Rules and its lies to USI to its advantage. Under the Contract and FMS procurement rules and Federal Acquisition Regulations, Festo was obligated to disclose to the Government contingency fees that were a part of the price. Festo then took the position that it did not need to pay USI's fees because these fees had never been disclosed by Festo to the Government - - although the USI fees had always been a part of the price. By not disclosing the USI fees, Festo not only breach its obligations to the Government, but it also committed a breach of its obligation to USI. On September 2, 2015, Festo

asked the Government if there is a statement in the Oman contract that prohibits Festo from paying any fees related to the contract.

91.    Specifically, Festo asked if the Government was aware of "a statement anywhere in the Oman contract [that] prohibit[ed] Festo from agreeing and/or paying any broker/dealer/agent/distribution any sales commission or compensation for the award of our contract."

92.    By asking if there was a clause in the contract that prohibited Festo from paying contingent fees, Festo was trying to obtain an instruction from the Government that it was not allowed to pay USI's compensation although that compensation was always a part of the selling price.

93.    The Government responded to Festo by providing the FMS procurement rules, which pursuant to section n obligated Festo to disclose such fees. According to the Government, Festo should have previously disclosed such fees to the Government in the LOA, but no such disclosure was made by Festo in the LOA.

94.    Within minutes of receiving the correspondence from the Government, Festo immediately copied "Restrictions on Subcontractor Sales to the Government" clause to their next correspondence to the Government, and responded to their own question inquiring about the existence of such a clause.

95.    On November 12, 2015, through a letter by Festo's CEO, Dr. Nader Imani, Festo once again attempted to trick the Government in order to obtain correspondence from the Government that would allow Festo to evade payment of USI's compensation. In doing so, Festo falsely referred to USI as an unrelated agent *(i.e.,* an agent unrelated to the MTCO transactions), despite agreements, quotes, calculations, years of updates, including those from the Government,

and dozens of documents showing USI margins in Festo's own calculations. USI was not only related to the MTCO transactions, but it was the fundamental reason that this order happened at all. And, of course, USI had an exclusive contract for this particular order as it was USI that had prepared and delivered the offer, including its compensation, which was accepted by MTCO.

96.    Festo never disclosed USI's role and its expectation of compensation even though the Government had paid Festo an amount that included USI's fees. Moreover, Festo's CEO subsequently reported that the size of Festo's profits "after maintenance contract costs..." would be a NET of $6.7 Million with a cost of $3million. However, this statement was entirely and intentionally false as there were and would in future be no significant maintenance costs. Festo's CEO also suggested to Government that the FMS contract prohibits only the unapproved fees and (if forced to do so), Festo would pay the fees from its profits.

97.    Knowing that there was undisclosed compensation to USI built into the original sales price set by USI, Festo essentially sought a statement from the Government that it was prohibited from paying that compensation to USI because that compensation had never been disclosed by Festo during the Government procurement process. This ploy failed entirely. The Government response was as follows:

> "An `allowable' cost, by definition in Part 31 of the FAR, is a cost to the government, not a cost to the contractor. So it does not make sense for Festo to say the contingent fee is an allowable cost that will not be paid by the government. In addition, payment out of `profit' is a slippery slope. What is `profit'? If Festo is implying that it will pay the contingent fees from proposed profit from an upcoming contract, then I would expect Festo's proposed profit rate to be very high to cover the cost of the unallowable contingent fees. In this case, the U.S. Government has paid for unallowable contingent fees. Also, we do not know where Festo obtained its interpretation that the FMS contract prohibits only the "reimbursement" of unapproved contingent fees. Finally, if the FMS contract is a firm, fixed price contract, it is very odd that Festo would be asking for the U.S. Government's consent to pay unallowable contingent fees. Festo does not need the U.S. Government's consent. Thus, I am

suspect and tend to believe that Festo is asking the U.S. Government the question in its letter dated November 12, 2015 in an attempt to bring the U.S. Government into the privilege of sharing the cost of unallowable contingent fees."

98.    The Government's response was correct. The Government had already paid Festo a price which included undisclosed and therefore unallowable contingent fees. As correctly guessed by Government, Festo's profit rate was very high at total profit of $8,128,088.63 out of the initial contract award of $11,099,361.00. Festo had already collected the undisclosed compensation for USI.

99.    Festo's CEO was unable to succeed in manipulating the Government. Rather than obtaining a statement which prevented it from paying the fees, the Government responded to Festo that the payment of the fees was a business decision of Festo's.

100.    33.  Despite the successful award of the contract originally sourced by USI, and payment by the federal government to Lab-Volt, Lab-Volt has now refused Festo, Festo refuses to pay the compensation due to USI under the April 10, 2012 agreement, repeatedly reaffirmed and ratified by Lab-Volt in communications with USI in April 2012, June 2012, October 2012, and May 2014.

7

101.   Thereafter, upon information and belief, the order was increased, and as such, so has the portion owed to USI under its exclusive agreement with Festo.

102.   Upon information and belief, the sale of equipment for the MTCO was the largest or one of the largest transactions in Lab-Volt's history and one of the reasons Festo AG (the German parent company of Festo) desired to acquire Lab-Volt. Upon the acquisition, Festo AG placed one of its officers in the role of President and CEO of Festo, namely Dr. Nadir Imani. Upon information and belief, Dr. Imani reported regularly to Festo AG. Dr. Imani had direct knowledge of and participated in the facts alleged herein. In or about early 2017, Festo AG repatriated Dr. Imani back to Germany where he now serves in a senior capacity at Festo AG. As a result of the foregoing, senior executives of Festo AG have knowledge of the improprieties alleged herein and Festo's continuing breach of its duties to USI.

103.   ~~34.~~ USI has repeatedly requested payment of its fees~~, including its 25% fee in the amount of $2,774,840.25~~.

104.   ~~35.~~ Festo has rejected these requests.

**FIRST COUNT**
**Breach of Contract**

105.   ~~36.~~ Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs of the Complaint as if same were fully set forth herein.

106.   ~~37.~~ Under the ~~Agreement, Festo, as Lab-Volt's successor,~~ exclusive arrangement between Lab-Volt and USI regarding sales intended for MTCO, Festo owes contractual duties to Plaintiff.

~~38.     Lab-Volt and~~

107. Festo ~~were~~is and was obligated to pay to USI that portion of the ~~agreed-upon commission of 25% for all of the goods it sold at Lab-Volt's list price in the Sale as well as 100% of any additional mark-up that was paid~~purchase price to Festo which exceeded Festo's net selling price. That net selling price was established at 75% of Festo's list prices.

108. ~~39.~~Further, ~~Lab-Volt and~~Festo ~~were~~was obligated to take any steps necessary in the contracting process to obtain the authorization of the government of Oman to pay this fee to USI.

109. ~~40.~~By reason of the foregoing, Festo has breached its contractual duties with respect to Plaintiff, including but not limited to the terms of the ~~Agreement~~agreement, by failing to pay ~~25%~~USI its allocated portion of the ~~total contract~~actual sales price ~~to USI collected by Lab-Volt as well as 100% of any additional mark-up that was paid~~which exceeded the Festo net selling price, and~~/or~~ by failing to secure authorization to pay the fee from the government of Oman.

110. ~~41.~~As a direct and proximate result, Plaintiff has incurred, and continues to incur, damages in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Festo as follows:

(a)   Awarding damages, plus pre- and post-judgment interest;

(b)   Granting legal fees and costs of suit; and

8

~~(c)~~

(c)     Granting such other and further relief as the Court may deem just and equitable.

## SECOND COUNT
### Unjust Enrichment

111.   ~~42.~~ Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs of the Complaint as if same were fully set forth herein.

112.   ~~43.~~ USI conferred a benefit on Festo by providing services to ~~Lab-Volt~~Festo, for which USI reasonably expected it would be compensated.

113.   ~~44.~~ USI's services enabled Festo to obtain the contract awarded to it by the United States Naval Air Warfare Center Training Systems Division, Orlando Florida.

114.   ~~45.~~ Festo's actual selling prices ~~included at least a 25% margin~~over and above its net selling prices given to ~~pay~~ USI~~'s commission as well as additional mark-ups,~~ which are owed ~~in full~~ to USI.

115.   ~~46.~~ Festo has retained all of the proceeds of its agreement with the United States government, and provided no compensation to USI for its services.

116.   ~~47.~~ This benefit was rightfully owed to USI and therefore obtained at USI's expense.

117.   ~~48.~~ Festo will be unjustly enriched if it is permitted to retain the benefit. WHEREFORE, Plaintiff demands judgment against Festo as follows:

(a)     Awarding damages, plus pre- and post-judgment interest;

(b)     Granting legal fees and costs of suit; and

(c)     Granting such other and further relief as the Court may deem just and

equitable.

9

**THIRD COUNT**

**Fraud**

118. ~~49.~~ Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs of the Complaint as if same were fully set forth herein.

119. ~~50.~~ By repeatedly transmitting the false ~~pro forma~~Pro-formas to USI ~~on June 19, 2012,~~and repeatedly falsely telling USI that the actual selling price for MTCO had been drastically reduced, Festo (then called Lab-Volt) intentionally misrepresented the structure and the value of the transaction.

120. ~~51. Lab-Volt~~Festo made such misrepresentation with the knowledge that it was false and with the intent that USI rely upon the false ~~pro~~Pro-forma.

121. ~~52.~~ USI reasonably relied upon the false ~~pro-forma~~documents and information given to it by Festo and has been injured as a result.

WHEREFORE, Plaintiff demands judgment against Festo as follows:

(a) Awarding damages, plus pre- and post-judgment interest;

(b) Granting legal fees, including punitive damages, and costs of suit; and

(c) Granting such other and further relief as the Court may deem just and equitable.

**FOURTH COUNT**
**Declaratory Judgment**

122. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs of the Complaint as if same were fully set forth herein.

123.   USI and Festo had an agreement that Festo would work with USI exclusively for the MTCO project.

124.   Festo has solicited additional products and services to MTCO for the MTCO project, including warranty, training, and calibration.

125.   Accordingly, Plaintiff is entitled to declaratory judgment that USI is entitled to compensation from Festo for the sale of products and services and any additional products and services for the MTCO project.

**FIFTH COUNT**
**Breach of the Implied Contract**

126.   Plaintiff repeats and re-allege each and every allegation as if fully set forth herein.

127.   Defendant promised to pay Plaintiff for the full value of the services provided to Defendant.

128.   However, Defendant has failed to fulfill their promises and obligations.

129.   Plaintiff has demanded that Defendant perform on its promises, but Defendant has refused to do so.

130.   As a direct, proximate and foreseeable result of Defendant's wrongful actions and breach of their promises, Plaintiff has suffered and continues to suffer substantial damages.

**SIXTH COUNT**
***Quantum Meruit***

131.   Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein

132.   Plaintiff provided services to Defendant for which it has not been compensated.

133.    Defendant knew, at the time of performance, that Plaintiff reasonably expected to be fairly compensated for the services provided.

134.    Defendant promised to pay Plaintiff for the full amount of services rendered.

135.    Payment has not been made for the full amount of the services rendered.

136.    As a result of the foregoing, Plaintiff is entitled to *quantum meruit* compensation for the and services rendered, for which Plaintiff has not been paid.

**SEVENTH COUNT**
**Promissory Estoppel**

137.    Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

138.    Defendant promised they would pay Plaintiff for the full am=ount of services rendered.

139.    Plaintiff reasonably relied on those promises and acted in reliance on those promises to its detriment.

140.    As a direct, proximate and foreseeable result of Defendant's wrongful actions and breach of its promises, Plaintiff has suffered and continues to suffer substantial damages.

WHEREFORE, Plaintiff demands judgment against Festo as follows:

(a)      Awarding damages, plus pre- and post-judgment interest;

(b)      Granting legal fees, including punitive damages, and costs of suit;

(c)      Issuing a declaratory judgement that USI and Festo have an agreement that USI shall receive compensation from Festo for all sales of products and services by Festo to MTC from October, 2014 onwards; and

(d)      Granting such other and further relief as the Court may deem just and

equitable.

Dated: ~~Newark, New Jersey~~

~~June 21, 2018~~ October 9, 2020

_____     /s/ Riza I. Dagli____

~~SILLS CUMMIS & GROSS P.C.~~



~~David L. Cook~~

~~One Riverfront Plaza~~
~~Newark, NJ 07102~~
~~Tel.~~
**BRACH EICHLER, LLC**
101 Eisenhower Parkway
Roseland, New Jersey 07068
Ph.: (973) 403-3103
rdagli@bracheichler.com

**CERTIFICATION PURSUANT TO L. CIV. R 11.2 AND 201.1**

Plaintiff, through its undersigned counsel, hereby certifies, pursuant to Local

Civil Rule 11.2, that the above-captioned matter in controversy, to the best of undersigned

BE:11180099.1/YAH002-277741

counsel's knowledge, is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

        Plaintiff further certifies, pursuant to Local Civil Rule 201.1, that it is seeking monetary damages believed to be greater than $150,000, exclusive of interest and costs and any claim for punitive damages. Therefore, this action is not appropriate for compulsory arbitration.

Dated: October 9, 2020

                    s/ Riza I. Dagli
                    **BRACH EICHLER, LLC**
                    101 Eisenhower Parkway
                    Roseland, New Jersey 07068
                    Ph.: (973) ~~643-7000~~403-3103
                    ~~Fax (973) 643-6500~~
                    rdagli@bracheichler.com
                    ~~dcook@sillscummis.com~~

~~10~~

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2 AND 201.1

Plaintiff, through its undersigned counsel, hereby certifies, pursuant to Local Civil Rule 11.2, that the above-captioned matter in controversy, to the best of undersigned counsel's knowledge, is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Plaintiff further certifies, pursuant to Local Civil Rule 201.1, that it is seeking monetary damages believed to be greater than $150,000, exclusive of interest and costs and any claim for punitive damages. Therefore, this action is not appropriate for compulsory arbitration.

Dated:     Newark, New Jersey
           June 21, 2018

SILLS CUMMIS & GROSS P.C.

David E. Cook

One Riverfront Plaza
Newark, NJ 07102
Tel. (973) 643-7000
Fax (973) 643-6500
dcook@sillscummis.com

11

*Counsel for Plaintiff*
*USI INTERNATIONAL INC.*