**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| USI INTERNATIONAL INC., | |
| Plaintiff, | |
| v. | Civil Action No. 15-8451 (MAS) (TJB) |
| | **OPINION** |
| FESTO DIDACTIC INC., | |
| Defendant. | |

**SHIPP, District Judge**

This matter comes before the Court on Plaintiff USI International, Inc.'s ("USI") breach of contract claim and alternative unjust enrichment claim against Defendant Festo Didactic, Inc. ("Festo"). The Court conducted a four-day bench trial (*see* Trial Trs., ECF Nos. 167-69, 171) and separately heard the parties' summations on October 5, 2022 (*see* Min. Entry, ECF No. 181). The parties submitted post-trial briefs with proposed findings of fact and conclusions of law on USI's claims. (ECF Nos. 173, 74.) The Court now states its findings of fact and conclusions of law[1] and enters final judgment on the merits of USI's claims. After careful consideration of the parties' submissions, evidence introduced at trial, and the applicable law, the Court enters judgment in favor of USI.

---

[1] To the extent that the findings of fact may be considered conclusions of law, they will be deemed conclusions of law. Similarly, to the extent that matters expressed as conclusions of law may be considered findings of fact, they will be deemed findings of fact.

## I.    BACKGROUND

### A.    Jurisdiction & Choice of Law

This action is before the Court on its diversity jurisdiction under 28 U.S.C. § 1332(a)(2) in that it is a civil matter for which the amount in controversy exceeds the sum of $75,000. Venue of this action appropriately lies in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(1) because Festo resides in New Jersey. The parties do not dispute subject matter jurisdiction or venue. The parties also agree that New Jersey law governs this action.

### B.    Procedural History

USI initiated this lawsuit against Festo for breach of contract and unjust enrichment under New Jersey common law.[2] The Court held a bench trial from August 29 through September 1, 2022. (*See generally* Trial Trs.) USI called several witnesses during its case-in-chief, including Dr. Kevin Whitt, Burak Yahsi, Jonathan Abbott, and Nader Imani. (*See* Trial Tr. 20-585.) Since Festo intended to call the same individuals, the Court allowed Festo to independently examine USI's witnesses. In addition, at the request of the parties, the Court allowed the parties to submit the full depositions of certain witnesses in lieu of live testimony. (*See* Final Pretrial Order § 3, Stipulation of Facts ("Stip. Facts") ¶ 1  ("The [p]arties stipulate that the following witnesses are unavailable and so the relevant portions of deposition transcript for each will be read into the record and that the witnesses will not be called to testify in person either in the [p]arties' [c]ase[-

---

[2] Before trial, Festo moved for summary judgment only as to USI's common law fraud claim. (ECF No. 122.) The Court granted Festo's motion, finding that the economic loss doctrine barred USI from bringing a parallel fraud claim in addition to its breach of contract claim. *USI Int'l, Inc. v. Festo Didactic, Inc.*, No. 15-8451, 2022 WL 345086, at *4-5 (D.N.J. Feb. 4, 2022), ECF No. 126.

]in[-][c]hief or on [c]ross [e]xamination. . . ."), ECF No. 149.)[3] At the end of all witness testimony, the parties presented closing arguments on October 3, 2022.

The parties submitted post-trial briefing and proposed findings of fact and conclusions of law. (ECF Nos. 173, 174.) The case is now ripe for the Court's adjudication. It does so first by making its findings of fact and then through the application of relevant laws.

## II.   FINDINGS OF FACT

The below factual findings are derived from facts the parties stipulated to in the Joint Final Pretrial Order (ECF No. 149), as well as the parties' trial exhibits, the witnesses' trial testimony, and the witnesses' deposition testimony.[4]

### A.   Background of Festo (and Lab-Volt Systems, Inc.)

1.      Lab-Volt Systems, Inc. ("Lab-Volt") originated as Buck Engineering Co., Inc., a New Jersey corporation, and changed its name in November 1995. (Final Pretrial Order § 3, Stip. Facts ¶ 13.)

2.      Lab-Volt provided technical, industrial, educational, and training goods and services for domestic and international projects. (*Id.* ¶ 14.)

3.      Festo Didactic SE (a public company registered in the European Union and headquartered in Germany) wholly owned FD Vehicle Inc. and utilized it to purchase all shares of Lab-Volt in April 2014. (*Id.* ¶¶ 15-16.)

---

[3] The Court allowed the parties to submit excerpts of the relevant depositions in addition to full copies of the depositions.

[4] The Court had the opportunity to hear witnesses' testimony and observe their demeanor during the course of the trial. After careful consideration, the Court makes an individualized credibility assessment of each witness and assigns the appropriate weight to the testimony based on the Court's conclusions with respect to credibility. Such determinations are reflected in the factual findings. To the extent the Court credits a witness' testimony that a party objected to, the Court overrules that objection.

4.      Festo Didactic SE and Lab-Volt began acquisition discussions in 2012 and KPMG International Limited conducted due diligence on the deal. (Imani Trial Tr. 471:9-11, 474:8-15.)

5.      On May 13, 2014, FD Vehicle Inc. merged with Lab-Volt, with Lab-Volt surviving in name. (*Id.* ¶ 17.) Lab-Volt amended its name in June 2014 to become Festo. (*Id.* ¶ 18.)

6.      At the time Lab-Volt became Festo, the board members of the surviving company were Dr. Daniel Boese, Dr. Nader-Iman Imani ("Dr. Imani"), Dr. Theodor Niehaus, Dr. Christian Engau, and Ralf Hermkens. (*Id.* ¶ 19.)

7.      Festo assumed the debts and liabilities of Lab-Volt as the surviving company. (*Id.* ¶ 21.)

8.      Festo has an address of 607 Industrial Way West, Eatontown, New Jersey. (*Id.* ¶ 22.)

9.      In taking over, Festo continued the business line of technical, industrial, educational, and training services for clients and also provided goods for domestic and international projects. (*Id.* ¶ 20.)

10.      Leading up to the integration between Lab-Volt and Festo, Peter Schluter ("Schluter") was the President of Lab-Volt from at least April 2012 until June 2014. (*Id.* ¶ 24.) Jeremy Duggan ("Duggan") was a Senior Vice President of Lab-Volt from at least April 2012 and worked at Festo until December 2017.[5] (*Id.* ¶ 23.) After the merger, Dr. Imani became the President of Festo. (*Id.* ¶ 25.)

---

[5] Duggan, undeniably a pivotal character in this story, "resides in Canada and . . . [was] unavailable," forcing the parties to offer his deposition under Federal Rule of Civil Procedure 32(a)(1). (Trial Tr. 4:13-14; *see id.* at 4:21-25, 5:1-24 (the Court inquiring into why Duggan is absent as a live witness and the parties representing that they "did [their] best" to produce him at trial).)

**B.      Background of USI**

11.      USI is incorporated in Belize and maintains offices throughout the world in countries such as the United Kingdom, Japan, Zambia, United Arab Emirates, and Turkey. (Yahsi Trial Tr. 120:7-13.) USI started as a family company in the 1960s out of a Turkish business venture.  (Yahsi Trial Tr. 121:12-21.)

12.      USI is in the business of brokering deals as a "turnkey contractor[] and procurement solutions packager." (Yahsi Trial Tr. 120:14-19.) In other words, USI will interact with a "foreign company or Government" that decides to undergo a project or procure equipment, and USI will find a "solution provider[] who will package and provide all items" based on USI's many relationships with manufacturers and suppliers around the world. (Yahsi Trial Tr. 120:19-25.)

13.      Burak Yahsi ("Yahsi") acted as the President of USI since 1991, which operated "all over the world," engaging in projects "mostly in central Asia, [the] Middle East, [and] Africa." (Yahsi Trial Tr. 122:1-19.)

14.      USI routinely solicited different equipment, consumables, and suppliers to allow a project to be wholly or partially turnkey for the ultimate client. (Yahsi Trial Tr. 123:4-16.) USI did so by relying on its relationships with manufacturers and suppliers, as well as its general knowledge of the market. (Pl.'s Post-Trial Br. 3, ECF No. 174 (citing Yahsi Trial Tr. 120:14-25).) USI often provided a list of items needed by the end customer, more or less acting as a broker. (*Id.* ¶ 5.)

**C.      Two Companies Collide: The History Between USI and Lab-Volt**

15.      USI and Lab-Volt go back decades as partners in business, with Yahsi believing the companies first interacted on a project together in the early 1990s.[6] (Yahsi Trial Tr. 124:22-25.)

---

[6] Duggan recalled early deals in Indonesia but failed to recall the year. (Duggan Dep. Tr. 19:5-17.)

After a successful initial project, USI and Lab-Volt continued to work on "countless" projects of different sizes around the world.[7] (Yahsi Trial Tr. 125:12-19.)

16.     Indeed, USI eventually fully owned Lab-Volt Europe through an agreement with Lab-Volt, and Yahsi personally owned the Lab-Volt Europe venture. (Yahsi Trial Tr. 126:21-24.) In 2008, after years of joint business together and a successful campaign in the Middle East, Lab-Volt asked Yahsi to buy Lab-Volt, too. (Yahsi Trial Tr. 126:21-25, 127:1-4.) But Yahsi did not do so. (*Id.*)

17.     During this time, Lab-Volt maintained a price list for equipment that it would outwardly display towards customers. (Duggan Dep. Tr. 22:7-10.) From this starting price, Lab-Volt "wanted 70 percent," and when Duggan was running the deal for Lab-Volt, he would say to agents brokering the deal, "Here's your price and here's your 25 percent discount and here's your net price, which is what you need to pay Lab-Volt if you get an order." (Duggan Dep. Tr. 22:9-17.)

18.     The agent was then free to charge the ultimate customer "[w]hatever they were going to charge the customer"—because most business was secured through a public tender offer, the pricing was "important" and had to be competitive. (Duggan Dep. Tr. 22:18-25.) Yahsi recalled that, historically, Lab-Volt would "appl[y] [a] minimum [of a] 25 up to 40 percent discount to [USI] and to all [its] agents" to incentivize the agent to broker a deal.[8] (Yahsi Trial Tr. 128:6-21.)

---

[7] The companies jointly operated in countries like Azerbaijan, Uzbekistan, Nigeria, Angola, Turkey, Yemen, Sudan, Libya, Egypt, Iraq, and "[a]lmost every country in [the] Middle East and Central Asia." (Yahsi Trial Tr. 125:15-25, 126:1.)

[8] Festo disputes that Lab-Volt ever paid USI more than twenty-five percent and accuses USI of providing no concrete examples or documented evidence. (Def.'s Post-Trial Br. ¶ 33, ECF No. 173.) The Court agrees that the only supporting evidence of this contention is Yahsi's testimony. (Yahsi Trial Tr. 278 (Yahsi conceding that before 2012 the parties did not have any written contracts but instead had informal agreements guided by prior course of dealings).)

USI would then prepare a list for the customer and make an offer on Lab-Volt's behalf. (Yahsi Trial Tr. 128:15-21.) Characterized as the parties' course of dealing, USI determined the price, contending that the ultimate price would "always" be "somewhere above [the] net price" and would in essence be USI's profit for brokering the deal. (Yahsi Trial Tr. 131:1-8.)

19.     Sometimes USI would purchase the equipment from Lab-Volt and then directly sell it to the buyer, receiving direct payment in return. (Yahsi Trial Tr. 131:9-16.) Other times, USI would sell the equipment on behalf of Lab-Volt and the customer would directly pay Lab-Volt, with Lab-Volt passing on a commission to USI. (Yahsi Trial Tr. 131:16-25.)

20.     The parties did not use written agreements before 2012 and instead relied on a general understanding established through twenty years of joint operation. (Yahsi Trial Tr. 278:20-25, 279:1-5.) For its part, Lab-Volt attempted to "avoid" formal agency agreements to reduce the risk of foreign regulatory liability. (*See* Duggan Dep. Tr. 77:11-17.)

**D.     The Omani Military Technical College Debacle: USI and Lab-Volt's Final Deal**

21.     The United States maintains a strategic partnership with Oman and fostered a military partnership for nearly two centuries. (Final Pretrial Order § 3, Stip. Facts ¶ 37.) The Oman Military Technical College (currently known as the Military Technological College (the "Military College")) is an accredited engineering school situated in Muscat, Oman. (*Id.* ¶ 40.) The school provides technical education and military training to the Omani people. (*Id.*)

22.     The instant dispute begins in 2012 and originates from a deal between USI and Lab-Volt (eventually Festo). In March 2012, USI "learned of an expiring opportunity to sell various electronics training equipment to [the Military College] through funding provided by the United States government." (*Id.* ¶ 44.)

23.     Specifically, the U.S. Government offered the Sultanate of Oman a Foreign Military Sale credit of $16 million. (*Id.* ¶ 46.) The U.S. Government periodically administers

Foreign Military Sales ("FMS"), a program for "transferring defense articles, services, and training to the United States' international partners and organizations," like Oman. (*Id.* ¶ 27.)

24.     As part of an FMS, the U.S. Government utilizes the Department of Defense's acquisition system and networks to procure equipment and services requested by eligible countries, either allowing that country to purchase the defense articles and services, or employing a sponsored assistance program where the U.S. Government provides the funds. (*Id.* ¶¶ 29-30.)

25.     Regarding potential projects stemming from the Military College in 2012, Festo claims to have been aware of the project before it was awarded, learning of a military college program in Oman in November 2011. (Pl.'s Ex. 9.) Then, in February 2012, Rhadakrishnan Nair ("Nair") of Westfield International ("Westfield") emailed Duggan (at Lab-Volt) about a project for an Omani military college. (Joint Exhibit ("J. Ex.") 23; Pl.'s Ex. 10.) Duggan shared information through e-mail communications with Yahsi and Nair regarding the equipment the Omani military college was looking to purchase. (J. Ex. 23; Pl.'s Ex. 10; Duggan Dep. Tr. 250:6-21.) From what the Court can glean, no agreement was reached between Lab-Volt and Nair.

26.     Enter Dr. Kevin Whitt ("Dr. Whitt"), a resident of the United Kingdom who owns the British company Linesman Limited. (Whitt Trial Tr. 21:8-14.) Dr. Whitt and USI had business dealings dating back well before 2012, where Dr. Whitt would bring deal opportunities to USI for the sale of equipment, and USI would pay Dr. Whitt a commission. (Pl.'s Post-Trial Br. 4-5.)

27.     Dr. Whitt was an acquittance of Professor Andrew Self ("Professor Self"), a scholar for the Military College in Oman. (Whitt Trial Tr. 25:5-10; Final Pretrial Order § 3, Stip. Facts ¶ 42.) Officially, Professor Self was a Senior Advisor at the Military College. (Final Pretrial Order § 3, Stip. Facts ¶ 42.)

28.     Dr. Whitt met Professor Self several years before 2012 when they engaged in business discussions for logistics management.[9] (Whitt Trial Tr. 25:16-19.) Dr. Whitt also met Yahsi in about 2007 before the two started doing business together. (Whitt Trial Tr. 24:4-16.) Dr. Whitt would bring USI opportunities in countries such as Yemen, Kazakhstan, Sudan, Turkmenistan, and Saudi Arabia. (*Id.* at 24:13-20.) USI would compensate Dr. Whitt based on a percentage of the ultimate contract, which fluctuated for each project. (*Id.* at 30:13-14.)

29.     Part of Dr. Whitt's involvement in large scale educational projects involved him providing advanced information that he secured through extensive traveling and a deep network of international connections. (Whitt Trial Tr. 22:14-24, 25:1-7.)

30.     The Military College project was previously bid for by international companies, but those contracts never came to fruition. (Duggan Dep. Tr. 25:3-19.) For example, Dr. Imani (representing Festo) met with Professor Self in 2011 as part of a discussion on solutions for building the Military College. (Imani Trial Tr. 558:15-22.) But Professor Self declined Dr. Imani's invitation to visit him in Germany, which Dr. Imani speculates was a result of Professor Self believing that the funding for the Military College was going to be provided by the British Government at that time. (Imani Trial Tr. 558:18-25.)

31.     Dr. Whitt and USI were interested in potential Omani projects (related to the Military College and otherwise) for "a while." (Whitt Trial Tr. 34:9-13.) Duggan and Festo were also generally aware of potential projects with the Military College, as Festo was in contact with Professor Self before 2012. (Imani Trial Tr. 527:3-5, 558:15-22.)

---

[9] Dr. Whitt and Festo had a rocky relationship in the past, stemming from a disagreement over whether Festo owed Dr. Whitt a commission for an unrelated project years before the 2012 Omani deal. (*See* Imani Trial Tr. 565:7-14; Whitt Trial Tr. 76:21-24.) In addition, Dr. Whitt has a direct financial incentive in the outcome of this litigation by way of a modest commission should USI recover an award in this matter. (Dr. Whitt Trial Tr. 76:9-20.) The Court therefore recognizes that Dr. Whitt is not a neutral observer of the relevant events.

32.     On April 3, 2012, Professor Self, representing the Military College, called Dr. Whitt to advise him that there was potential American funding credit for the Omani Government to use for the purchase of training equipment for the Military College. (Whitt Trial Tr. 31:6-23, 35:13-25.) Dr. Whitt understood that the U.S. Government credit was set to expire within a few days, which would squander any opportunity for Dr. Whitt, USI, Festo, or any other company to provide equipment to the Military College with U.S. funds after that date. (*Id.* at 35:16-25, 39:21-25.) That knowledge was presumably shared by Professor Self on his April 3, 2012, call with Dr. Whitt. (*Id.* at 80:16-25, 81:1-15.)

33.     Emphasizing the looming deadline, Professor Self told Dr. Whitt that he needed product information on training equipment that could be purchased with the expiring American credit for the Military College. (*Id.* at 35:15-25.) Dr. Whitt quickly relayed this information to Yahsi. (*Id.* at 82:1-12.)

34.     Putting aside generalized knowledge of the Military College and its ambitions to purchase equipment, Yahsi was the first individual to inform Duggan and Lab-Volt of the expiring American fund credit. (Duggan Dep. Tr. 34:16-22 ("[Q.] [I]t was Mr. Yahsi who presented this opportunity to you, this particular funded opportunity to you? [A]. Yes.").) No witness credibly rebutted the fact that Professor Self first told Dr. Whitt about the expiring American funds on April 3, who in turn informed Yahsi, who subsequently informed Duggan. The parties do disagree, however, as to whether Dr. Whitt was in London when he had the morning conversation with Professor Self (Whitt Trial Tr. 80:22-25 ("It would be a telephone [conversation] – I was in England.")) or in Dubai with Duggan and Yahsi (Duggan Dep. Tr. 24:16-19 (Duggan describing how he was with Dr. Whitt and Yahsi in Dubai on April 3), 26:24-25, 27:1-3 (describing how Dr.

Whitt used Duggan's phone to speak with Professor Self before announcing to the group that there was an American funding opportunity)).[10]

35.    Presumably in response to their phone conversation, Dr. Whitt emailed Professor Self a link to Lab-Volt's website with a note that Dr. Whitt would be meeting with Professor Self on Friday, April 13, 2012. (Pl.'s Ex. 36.)

36.    To recap in more detail these important events, after Dr. Whitt and Professor Self got off the phone, Dr. Whitt emailed Yahsi a little after 8:00 AM.[11] (J. Ex. 137.) Dr. Whitt wrote to Yahsi that Professor Self "has some US offset [funds]" and that "they" know Lab-Volt well, so if Dr. Whitt and Yahsi "get USI/Lab[-V]olt an award under US off-set then [it] will set the stage for more awards under [the Omani's] own budget."[12] (J. Ex. 137.) Dr. Whitt also relayed to Yahsi on a subsequent phone call that morning that they needed to act urgently because the budget was expiring. (Yahsi Trial Tr. 132:20-25.) Yahsi recalls that Lab-Volt was a viable recommendation for the project for several reasons, including that USI had a longstanding relationship with Lab-Volt and that USI owned Lab-Volt Europe, therefore ensuring USI "had every kind of information" it needed to present the offer quickly to Professor Self. (Yahsi Trial Tr. 133:1-5.)

37.    Yahsi called Duggan that morning to inform him of an "imminently expiring American Budget" and offered for USI and Lab-Volt to "work exclusively" to secure the deal.

---

[10] Professor Self passed away "in or around April 2015." (Final Pretrial Order § 3, Stip. Facts ¶ 43.)

[11] Yahsi recalls instructing Dr. Whitt to send Professor Self Lab-Volt's product list. (Yahsi Trial Tr. 136:3-12.) It appears from the e-mail communication metadata, however, that Dr. Whitt sent Lab-Volt's product list to Professor Self before he emailed Yahsi, suggesting that Dr. Whitt sent the list on his own accord. (*Compare* J. Ex. 137, *with* Pl.'s Ex. 36.) In any event, either Yahsi or Dr. Whitt made the decision to send Lab-Volt's product list to Professor Self, which Dr. Whitt did the morning of April 3. (J. Ex. 137; Pl.'s Ex. 36.)

[12] Dr. Whitt testified that "they" in his email referred to the Project Implementation Unit of Omani and not Professor Self, who Dr. Whitt claims "never heard of Lab-Volt." (Dr. Whitt Trial Tr. 82:19-24.)

(Yahsi Trial Tr. 135:23-25, 136:1-4.) Considering the urgency of the matter, Yahsi told Duggan they "will put it in writing" later. (Yahsi Trial Tr. 136:2-3.) Duggan accepted this proposal. (Yahsi Trial Tr. 136:13-16.) Yahsi subsequently called Dr. Whitt and told him to send Lab-Volt's equipment list to Professor Self, including model numbers and descriptions of the products. (Yahsi Trial Tr. 136:3-12.)

38.     The next day, April 4, Professor Self emailed Dr. Whitt with his initial equipment list and a request for estimated costs of the equipment before Saturday, as well as advice on any of the items. (Pl.'s Ex. 37.) The Saturday deadline was necessitated by the expiring credit, and Dr. Whitt believed that completing the task in such a short time would be difficult. (Whitt Trial Tr. 39:10-25.)

39.     Well before sunrise on April 5, 2012, at around 2:00 AM, Dr. Whitt responded to Professor Self, writing that he was "working on it" and that the deadline would not be an issue. (Pl.'s Ex. 40.) Dr. Whitt then immediately sent Professor Self's email and attached equipment list to Yahsi to initiate the pricing process and allow USI to prepare the estimate. (Pl.'s Ex. 41; Whitt Trial Tr. 43:15-25.) Within minutes, Yahsi emailed Duggan the equipment list and informed him that it was the list for the Military College project for which they needed urgent pricing. (Pl.'s Ex. 39.) Yahsi included in his email that he would call Duggan later that day. (*Id.*)

40.     Around 3:00 AM, about an hour later, Yahsi emailed Duggan attaching the same copy of Professor Self's list and explaining that the U.S. funds were confidential and that the price list was needed by Saturday. (J. Ex. 1.) Yahsi mentioned that USI would invite Professor Self to London for a conference on schools and that Yahsi was considering using his company, Lab-Volt Europe, to make the sale to the Omanis. (*Id.*) Yahsi further mentioned that he expected an immediate order once they finalized the price list. (*Id.*) Duggan then asked Yahsi a few questions about the equipment list and how to provide certain quotes. (*Id.*; Yahsi Trial Tr. 140:15-24.)

41.     Later that day, Duggan provided two proforma invoices to Yahsi that indicated USI was the "customer," detailed the list of equipment requested by Professor Self with unit prices, and listed a twenty-five percent discount that allowed for a "[net]" equipment price.[13] (J. Ex. 3.) In addition, the invoice quoted installation costs and training costs. (*Id.*) USI did not receive a commission or "25% discount" on training, installation, shipping, or warranties. (Duggan Dep. Tr. 113:14-19; Yahsi Trial Tr. 223:7-17.)

42.     List in hand from Lab-Volt, USI edited the invoice to delete its own name as the customer and increase the list prices by twenty-five percent, which USI described as preparing the routine "[USI] price," while simultaneously deleting the above-noted twenty-five percent discount on the bottom. (J. Exs. 5, 5A, 47, 47A, 48; Pl.'s Exs. 43, 43A; Yahsi Trial Tr. 157:4-13.) In sum, USI returned the equipment price to its list price with no discount and then added an additional twenty-five percent. (*See* Pl.'s Ex. 43; Yahsi Trial Tr. 302:4-7.) USI also expanded on some of the routine Lab-Volt conditions to provide more of an explanation. (Yahsi Trial Tr. 160:20-24.) In all, USI contends that it created a forty-percent profit margin for itself after allotting the list price (with a twenty-five percent discount) for Lab-Volt. (Yahsi Trial Tr. 302:12-17.) One listed condition in the proforma was that the equipment came with a standard one-year warranty. (Pl.'s Ex. 43.)

43.     Along with the invoice, USI prepared catalogs of the equipment and corresponding contractual conditions to send to Professor Self. (Yahsi Trial Tr. 157:9-13.) USI's decision to increase the list price was not discussed with Duggan at this time, a practice described as "business as usual" by Yahsi. (Yahsi Trial Tr. 303:14-18.)

44.     On April 6, 2012, USI sent Dr. Whitt an email with an offer it prepared on Lab-Volt's behalf, along with brochures and supporting documents for the equipment. (Whitt Trial

---

[13] The second invoice had a slight variation from the first in that it included newer equipment for one item that was slightly less expensive. (*Compare* J. Ex. 3, *with* J. Ex. 4.)

Tr. 46:15-21; Pl.'s Ex. 43 ("Hello [Dr. Whitt], [p]lease find enclosed the Lab-Volt offer and conditions of offer for Oman List . . . .").) Belgin Sahinkaya, a USI representative, informed Dr. Whitt that the offer listed conditions requested by Professor Self, the specific equipment that Professor Self asked about (Series 3500 for mobile instrument process control), and an invitation to make any necessary changes. (Pl.'s Ex. 43; Whitt Trial Tr. 47:5-9.) The invoice sent to Dr. Whitt represented "the price that Mr. Yahsi was asking the college to pay," which included a forty percent profit margin for USI.[14] (Whitt Trial Tr. 52:4-13.)

45.     That same day, Dr. Whitt sent the invoices, brochures, and supplemental conditions to Professor Self. (Pl.'s Ex. 42 ("Hi Prof[essor Self], [p]lease click an[d] download offer. See you Friday next."); Whitt Trial Tr. 57:17-22.) Dr. Whitt believed he was meeting with Professor Self that upcoming Friday in Oman. (Whitt Trial Tr. 59:19-21.) Yahsi emailed Duggan shortly after to let him know that the offer was submitted on time. (J. Ex. 133; Yahsi Trial Tr. 162:1-7.)

46.     Professor Self responded the next day thanking Dr. Whitt and asking for an explanation on some of the terms. (Pl.'s Ex. 45.) Dr. Whitt provided answers within an hour or so. (*Id.*)

47.     A few days later, Yahsi and Duggan were in Dubai together. (Yahsi Trial Tr. 171:11-17.) Yahsi wanted to memorialize USI and Lab-Volt's agreement and requested that Duggan provide him a letter for them to sign with Yahsi's preferred phrasing. (Yahsi Trial Tr. 171:1-7.) Originally drafted on Lab-Volt letterhead by Yahsi, Duggan delivered the signed agreement to Yahsi on April 10—the agreement read as follows:

> Dear Burak [Yahsi],
>
> This letter is to confirm that Lab-Volt is working with USI International Inc. exclusively on the current Oman Military

---

[14] As to this invoice, the total list price was $9,322,002, plus installation and training. (Pl.'s Ex. 43.)

> Technical College offset funding direct purchase project. Under the terms of the funding[,] we expect a direct order to Lab-Volt without a tender, and therefore Lab-Volt will pay the full agent's commission of 25% to USI Internal Inc[.] if the equipment is purchased at [the] full Lab-Volt List Price.
>
> Sincerely yours,
> Jeremy Duggan

(J. Ex. 50; *see also* Yahsi Trial Tr. 171:2-17.)

48.     At the time the letter was drafted, Yahsi understood that Lab-Volt would engage in a direct purchase and then pay USI its commission. (Yahsi Trial Tr. 173:12-19.) Moreover, the Military College project would be a sole-source contract awarded to Lab-Volt without a tender. (Yahsi Trial Tr. 174:1-12.) The U.S. Government was to pay Lab-Volt directly under the deal. (Yahsi Trial Tr. 176:11-21.) In agreeing to the formal letter, Duggan understood that "Yahsi had found the money for this project and wanted exclusivity." (Duggan Dep. Tr. 77:18-25.)

49.     A few days later, Dr. Whitt, Yahsi, and Duggan traveled to Muscat, Oman. (Whitt Trial Tr. 63:14-25, 64:1-13.) On or around April 13, the group met with Professor Self and other individuals from the Omani Ministry and elsewhere for a meeting that turned into a celebratory dinner in light of Lab-Volt's offer.[15] (Whitt Trial Tr. 63:14-25, 64:1-13; Pl.'s 47.) Dr. Whitt was still fielding questions from Professor Self about the equipment, as well as postulating other potential suppliers should the U.S. Government reject Lab-Volt's offer to the Omanis. (Pl.'s Ex. 50.) Nonetheless, the group was optimistic that the offer would be accepted because it was received by the American Embassy and was yet to be rejected. (Whitt Trial Tr. 64:14-18.)

50.     USI and Duggan continued to correspond via e-mail communications on April 14, 2012, regarding the satellite trainer information and offer. (J. Exs. 134, 134A, 135.) USI and Dr. Whitt remained the main sources of communication between Lab-Volt and Professor Self. (Yahsi

---

[15] Yahsi organized the celebratory dinner. (Whitt Trial Tr. 64:19-21.)

Trial Tr. 181:13-17.) During this time, the parties were fixated on the Omani Government sending

the U.S. Government a Letter of Request to formalize the deal. (Yahsi Trial Tr. 186:10-18.)

### E.    A Short-Lived Honeymoon: USI and Lab-Volt's Fallout

51.    In the week following the April 13, 2012, dinner, the U.S. Embassy in Oman called

Duggan regarding Lab-Volt's submitted offer.[16] (Yahsi Trial Tr. 189:18-22.)

52.    According to Yahsi, after the celebratory dinner Duggan became "unreachable" on

a regular basis. (*Id.* at 188:22-25.) On April 18, 2022, Duggan sent Yahsi a lengthy e-mail

communication informing Yahsi that (1) Nair was now in the mix as a second agent and

(2) Lab-Volt needed to reduce its prices. (*Id.* at 189:1-14 (citing J. Ex. 7).) As to the first raised

issue, Duggan expressed to Yahsi that Nair worked with Duggan on Omani projects for ten years

and therefore he should be considered the exclusive agent for all deals in Oman. (J. Ex. 7 at 2.) As

Duggan told it, he believed the deal involved offset money, not FMS money, and as a result there

would need to be a "dramatic reduction in price." (*Id.* at 3.) Duggan also expressed concerns that

the Omanis had to agree to any commission and separately that the U.S. Government may impose

limits on any commission. (*Id.*) But Yahsi believed Duggan was just trying to divert USI

commission to other agents. (Yahsi Trial Tr. 189:9-14.)

53.    Yahsi responded that he did not raise the final price beyond the list price, but that

Dr. Whitt or Professor Self may have done so.[17] (J. Ex. 25 at 1.) Yahsi informed Duggan that he

---

[16] A separate company unrelated to this litigation, LJ Create, was also awarded a contract for equipment (sole source) related to the Military College project. (Hoffman Dep. Tr. 25:13-16; Gifford Dep. Tr. 61:2-11.) Because both Lab-Volt and LJ Create "each had a portion [of the project] and they each delivered distinctly different products," the Court spends little ink discussing LJ Create. (Gifford Dep. Tr. 61:2-11.)

[17] The Court finds that the documented evidence supports a finding that USI did submit an invoice on behalf of Lab-Volt that exceeded the original list price. (J. Exs. 3, 3A, 4, 4A.) The Court credits Dr. Whitt's testimony that he had "nothing to do with the pricing," as that contention is supported by the evidence. (*See* Whitt Trial Tr. 158:23-25.)

could reduce the price to the normal list price originally quoted if necessary. (*Id.*) Yahsi, Duggan, and Dr. Whitt continued looking into the regulatory requirements for FMS. (*E.g.*, Whitt Trial Tr. 10-24, 79-83, 112-13, 135, 205-12, 240-42; Duggan Dep. Tr. 79:16-25, 80:1-5.) Duggan claims that he believed at the time he executed the April 10 letter agreement that the deal would involve offset money and not FMS money, which came with additional restrictions regarding the use of agents. (Duggan Dep. Tr. 80:9-18, 81:1-9.)

54.     Over the next few weeks, Yahsi and Duggan engaged in several confrontational conversations with each other, both by telephone and e-mail communications, as the parties navigated the early stages of the transaction in April. (*Id.* at 265:3-25, 266:1-19; J. Ex. 28.) Duggan informed Yahsi on April 20, 2012, that he was able to negotiate with Nair and would "see what [Lab-Volt] [could] do" about paying a commission to USI for an FMS transaction. (J. Ex. 29.)

55.     Also in April 2012 and the two-year period that followed, Lab-Volt (through Duggan) began corresponding with the U.S. Government regarding the sale of equipment to the Military Collage. (Duggan Dep. Tr. 294:24-25, 295:1-3 (explaining that the process took around two-and-a-half years).) Lab-Volt and the U.S. Government were attempting the finalize the Letter of Acceptance by working through the specifics of the deal. (Duggan Dep. Tr. 292:13-25, 293:1.) USI took a backseat at this point and had no interactions with the U.S. Government. (Yahsi Trial Tr. 315:16-23.)

56.     Duggan went on to inform Yahsi of important events that unfolded, including: (1) when the U.S. Government received the Letter of Request on April 30, 2012 (J. Ex. 67); (2) what was occurring while Lab-Volt awaited a response from the U.S. Government (*e.g.*, J. Exs. 68, 69); (3) additions to the equipment list and associated services such as training (Pl.'s Ex. 142); (4) the U.S. Government's request for an updated invoice dated June 6, 2012, that was lower than

the original USI invoice[18] (J. Exs. 8, 8A, 72; Yahsi Trial Tr. 214-16, 222:3-24, 223:3-23), and

(5) other routine updates about Lab-Volt's discussions with the U.S. Government (J. Exs. 55, 73).

57.     In October 2012, Duggan emailed Yahsi to inform him that despite the managerial

change at Lab-Volt, the new executives "are fully aware of the commitment to [USI] to pay the

consulting contract [they] discussed."[19] (J. Exs. 12, 79, 88.) Two months later, Duggan again

emailed Yahsi and Dr. Whitt that Lab-Volt intended to honor its promises to USI regarding the

Military College, even though Lab-Volt had new managers that were supervising projects in the

Middle East.[20] (J. Ex. 13.)

58.     In April 2013, the U.S. Government signed a Letter of Acceptance for an FMS

credit of $16 million set to expire in July 2013. (Final Pretrial Order § 3, Stip. Facts ¶ 46; J. Ex.

53.) It appears that the new Omani quote for Lab-Volt equipment added an additional $2,600,499

to the total price. (J. Exs. 108, 108A.)

---

[18] The parties vigorously contest the significance of Duggan's June 2012 invoice to USI. According to USI, Duggan fraudulently sent Yahsi a doctored invoice to significantly reduce the commission owed to USI. (Pl.'s Post-Trial Br. 20 ("Defendant's purpose in sending the fake proformas with the reduced prices was to conceal the fact that Defendant intended to pay a third-party, Radha Nair, the exact margin that USI had added to the List Price, through the use of a sham five-year extended warranty.").) Conversely, Lab-Volt and Duggan consider it an innocent mistake or a then-accurate draft invoice that was superseded before the deal closed with the U.S. Government. (Def.'s Post-Trial Br. ¶ 170 (citing Duggan Dep. Tr. 132-34, 278-79.).)

[19] Festo contends that Duggan's reference to the consulting contract concerned a separate consulting agreement with USI as a way to abide by FMS rules that may prevent commissions. (Def.'s Post-Trial Br. ¶ 179 (citing Duggan Dep. Tr. 119-21, 153, 165, 222-23).) All parties agree that USI never entertained a modification of the original agreement or a new consulting agreement. (Yahsi Trial Tr. 284:22-25.)

[20] According to Duggan, behind the scenes, Peter Schluter declined to inform Duggan what USI's ultimate percentage would be until there was a final order. (Duggan Dep. Tr. 121:11-20.) But Schluter did instruct Duggan to "ensure Mr. Yahsi that he would be paid 25 percent of the list price." (Duggan Dep. Tr. 109:12-18.)

59.     The new proforma that Lab-Volt prepared in August 2013, totaling $11,727,015, reflected an equipment price of $11,587,015, with $30,000 for installation, $40,000 for training, and $70,000 for shipping. (J. Ex. 34; Duggan Dep. Tr. 288:1-10.) The conditions included with the August 2013 proforma noted that the "[p]rice include[s] [five] years on-site service," with Lab-Volt arranging a service technician to be available five days per week.[21] (J. Ex. 34.)

60.     No matter the origin of the five-year service contract, that version of the warranty unequivocally started appearing in at least 2013 within (1) the U.S. Government internal communications (J. Ex. 113 at 2), (2) meeting minutes between the Omanis and the U.S. (J. Ex. 110, at 10 (confirming the five-year warranty over the one-year warranty originally requested)), (3) U.S. Government presentations (*id.* at 10-11 (describing a summary of the Government needs as "provid[ing] a [five]-year of full warranty")), and (4) executed amendments to the Letter of Acceptance (J. Ex. 64).

61.     USI and Lab-Volt continued to communicate about the Military College project as the seasons changed and 2014 rolled around. (*E.g.,* J. Ex. 91 (Duggan informing Yahsi that Lab-Volt is responding to "endless" questions about the training program for the Omani project).)

62.     In April 2014, the U.S. Government approved the statement of work for the Omani contract that included a five-year warranty. (J. Ex. 59 at NAVY003869, 3880.)

63.     In 2014, between the creation of the letter of offer and the acceptance of the contract award, Lab-Volt was acquired by Festo. (Abbott Trial Tr. 370:12-20.)

64.     In light of the merger between the two companies, Schluter decided to rebrand USI's involvement in the Omani deal as a "finder's fee" to comport more with Festo's business model. (Duggan Dep. Tr. 152:18-25, 153:1-6.) Duggan then created a new document detailing the

---

[21] USI adamantly contends that the five-year warranty was a "sham" to reduce the commission owed to USI and further enrich Lab-Volt. (Pl.'s Post-Trial Br. 21-24.)

grand total for the Omani Military College deal, the total equipment price within that deal, and a "USI Finder[']s Fee" constituting twenty-five percent of the equipment cost ($9,350,798) less the spare parts ($570,000), for a total of $2,195,199.50 owed to USI. (Pl.'s Ex. 121.)

65.    Schluter emailed Daniel Boese at Festo in May 2014 to provide an estimate of the net proceeds for the Omani deal and to flag that it is forecasted that Lab-Volt "will be paying USI" a "finder[']s fee  of [twenty-five percent] according to Jeremy Duggan's commitment by email of April 10, 2012." (J. Ex. 11 at 1.)

66.    Shortly after, Duggan sent Yahsi the following email: "Dear [Yahsi], . . . [a]s you know Lab-Volt recognizes my letter of April 10, 2012 as a commitment to USI International in regard to the Oman Project. In addition I confirm that Festo has been informed of this commitment." (J. Ex. 14.)

### F.    Closing the Deal: Festo Consummates its Omani Deal

67.    Jonathan Abbott ("Abbott"), a senior contract specialist for the U.S. Navy, was the U.S. Government's point of contact after June 2014, replacing the retiring William Aman who worked on the deal before that time. (Abbott Trial Tr. 389:16-20.) Duggan informed Abbott that Lab-Volt was now Festo within a week or so of Abbott joining the project. (J. Ex. 39 at 1.)

68.    Abbott communicated frequently with Duggan about finalizing the project, including negotiations between the Navy and Festo regarding price and whether that price was fair. (Abbott Trial Tr. 387:23-25, 388:1-6, 399:3-25, 400:1-2.)

69.    Abbott was unfamiliar with any contingency fees associated with the award of the Omani contract, and was similarly unfamiliar with Yahsi and Nair. (*Id.* at 381:22-25, 382:1-9.) According to USI, Duggan concealed from the U.S. Government and the Omanis the existence of USI or Nair. (*See* Pl.'s Post-Trial Br. 23.) This concealment came to fruition when the U.S. Government began questioning Duggan about the listed price for equipment. (J. Ex. 15 at 1.)

70.     As part of their numerous communications, Abbott questioned Duggan about the discrepancy between Lab-Volt's list price and the verified price in the proposal. (Abbott Trial Tr. 421:16-25, 422:1-7; J. Ex. 41.) Duggan explained that the proposed prices included an additional five percent "for each of the [four] extended years" in the warranty, resulting in upwards of a fifteen to twenty percent premium over the list price. (J. Ex. 41 at 1.) After receiving the e-mail correspondence from Duggan, Abbott understood the difference was explained by the extended warranty, which he admitted was "rare for [G]overnment contracts." (Abbott Trial Tr. 423:3-16.)

71.     In July 2014, Festo sent the Navy a proforma with a total equipment price of $11.4 million, including a five-year warranty, and a breakdown of different items such as installation ($30k), training ($40k), consumables ($196k), and shipping ($70k), for a total of $12,377,597. (J. Ex. 9, 22, 22A; Final Pretrial Order § 3, Stip. Facts ¶ 54; J. Ex. 124.) Thereafter Festo and the Navy continued negotiations, with Duggan being the sole point of contact for Festo. (Abbott Trial Tr. 387:23-25, 388:1 (Abbott only recalls communicating with Duggan).)

72.     Duggan continued to crunch the numbers on his end, communicating with Festo Didactic SE and Dr. Imani regarding Abbott's position on the contract pricing and terms. (J. Ex. 20 at 1.) Abbott indicated to Duggan that the offer's lab equipment price includes five years of on-site service and one year of part replacements, per Festo's previous proforma proposal. (*Id.*) As part of Duggan's e-mail communications, he indicated internally that the total contract price still encompasses the twenty-five percent that Festo "would normally pay as an agent commission." (*Id.*)

73.     One month later, after a long process, Festo accepted the Government's final offer. (J. Ex. 42 at 3.) Overall, Duggan and the U.S. Government determined that the ultimate price of the contract was reasonable. (Abbott Trial Tr. 425:1-4.)  In September 2014, Abbott informed Festo that the installation price was baked into the equipment price. (J. Ex. 42 at 4.)

74.     Festo had last-minute concerns that the project needed to be changed to a tender (i.e. they would bid for the contract price), as opposed to sole source (i.e. the contract is simply awarded to Festo). (J. Ex. 19 at 5.)

75.     The explanation for why the sudden change in heart depends on who you ask. According to USI and even Duggan, Dr. Imani was trying to change the structure of the deal to a tender to avoid paying any agent (such as USI) a commission. (Pl.'s Post-Trial Br. 28; Duggan Dep. Tr. 198:15-24 ("I believe Festo did not want to pay the commissions promised by Lab-Volt.").) Festo, on the other hand, characterizes the request as an attempt to satisfy compliance concerns and not have the Omani deal run afoul of U.S. or international regulations. (J. Ex. 19 at 3-4 (Duggan asking the Navy whether the deal could be changed to a tender to avoid potential regulatory scrutiny).)

76.     In any event, the Navy informed Duggan that "[t]he procurement cannot be changed to a tender."[22] (*Id.* at 4.)

77.     In October 2014, Abbott sent Duggan the final contract for Festo's execution. (J. Ex. 111.) Dr. Imani signed the finalized contract. (J. Ex. 57 at NAVY000334; *Id* ¶ 57.) In the end, the contract was sole-sourced and not a tender. (Final Pretrial Order § 3, Stip. Facts ¶ 60.)

78.     The final contract was for $11,099,361. (Final Pretrial Order § 3, Stip. Facts ¶ 66.) Lab equipment constituted $10,414,569 of the total contract price; consumables $165,258; the five-year warranty $479,534; training $40,000. (J. Ex. 57 at NAVY000307.)

79.     Notably, the $10,414,569 for equipment was further broken down by $9,585,569 of actual equipment costs; $800,000 for the extended service portion of the warranty; and $30,000 for

---

[22] The Court finds that Dr. Imani likely had dual motivations to change the deal to a tender, with the primary motivation being the avoidance of paying all agent commissions. It is not incredulous to speculate, however, that Dr. Imani also wanted to avoid potential regulatory scrutiny.

installation. (Abbott Trial Tr. 427:8-25, 428:1-23, 435:14-18, 440:4-15, 441:6-24; *see also* J. Ex. 42.) The extended service warranty included in the equipment price addressed "repair or replace of the items that could be done in [Oman]" (J. Ex. 57 at NAVY000308; Abbott Trial Tr. 427:20-25) whereas if equipment needed to be sent back to Canada for repair or replacement, that was covered by the separated-out five-year warranty that was priced at $479,534 (J. Ex. 57, Item No. 003; Abbott Trial Tr. 427:3-25, 428:1). At bottom, as modified and approved by the U.S. Government through Abbott's negotiations with Festo, the actual equipment price was $9,585,569. (Abbott Trial Tr. 427:20-25, 42:1.)

80.     The U.S. Government paid Festo the total contract price (less the warranty) on delivery and acceptance of the equipment. (*See* Pl.'s Ex. 128; *see also* Final Pretrial Order § 3, Stip. Facts ¶ 69.) The warranty payments were made annually over the life of the warranty. (Abbott Trial Tr. 444:3-6.)

81.     Westfield, Nair's company, ultimately did not end up providing the five-year service portion of the contract as Festo originally planned. (Imani Trial Tr. 508:24-25.) Instead, Festo provided warranty services of approximately $80,000 a year under the contract. (*Id.* at 573:1-5.)

82.     A representative of the U.S. Government conducts "warranty checks twice a year." (Gifford Dep. Tr. 62:13-24.) Festo maintained an onsite representative in Oman to maintain the equipment around the clock. (*Id.* at 63:1-16.) The Omanis issued no complaints to the U.S. Government over the course of the five-year service warranty. (*Id.* at 63:17-20.)

83.     Festo made a "good profit" on the Omani deal, coming close to or exceeding the company's normal annual profit through this deal alone. (Imani Trial Tr. 582:1-25, 583:1-21.)

84.     Once litigation between USI and Festo became apparent, Festo wrote to the U.S. Government to obtain its position as to whether there are regulations that prohibit its paying of contingent fees to agents. (Pl.'s Ex. 115 at 1.) The Navy internally expressed concern over this

development (Pl.'s Ex. 109 at 1), but ultimately concluded that Festo "is not precluded from paying the fees, [it] just can't be reimbursed by" Government funds (*id.*). But the Navy informed Festo that it was uninvolved with the payment of disputed contingent fees, an issue that "is solely a business decision on the part of Festo." (Pl.'s Ex. 208 at 3.)

85.     USI demanded payment from Festo for the Omani Military College project. (Final Pretrial Order § 3, Stip. Facts ¶ 67; Def. Ex. Q.) In demanding payment, USI claimed it was entitled to twenty-five percent of the contract price. (Def.'s Ex. Q.)

86.     After USI and Festo failed to reach a peaceful resolution, this litigation ensued.

## III.   PARTIES' POSITIONS

USI contends that it has shown by a preponderance of the evidence, through testimony at trial, testimony through depositions, and exhibits, that USI had a binding contract with Lab-Volt (enforceable against Festo) for a contingency on its award of the Omani Military College contract. (*See generally* Pl.'s Post-Trial Br.) As such, USI asks the Court to award it a total of $4,423,744.40, which it contends is the agreed upon portion of the final contract that it had with Lab-Volt, plus attorneys' fees, punitive damages, costs, and interest, for good measure. (*Id.* at 71, 86.) In the alternative, USI argues that it should at least be entitled to a judgment for unjust enrichment and damages in the absence of a binding contract, based on Festo's windfall predicated on USI's efforts. (*Id.* at 77-81.)

For its part, Festo avers that USI failed to establish that it had a binding contract as a matter of law because there was no meeting of the minds, the terms were not reasonably defined, conditions precedent were not met by USI, and the contract was illegal. (Def.'s Post-Trial Br. ¶¶ 338-49.) Similarly, Festo claims that USI's unjust enrichment claim also fails to stand legal muster because USI did not "get[]" Lab-Volt the equipment contract for the U.S. Navy and therefore did not confer any benefit on Festo. (*Id.* ¶¶ 370-76.) Finally, Festo stresses that any claims

by USI for attorneys' fees, punitive damages, or prejudgment interest are unwarranted. (*Id.* ¶¶ 377-91, 398-403.)

## IV. CONCLUSIONS OF LAW

Having completed its judicial fact-finding, the Court moves next into its conclusions of law based on those facts. The Court will proceed as follows. *First*, the Court considers whether under New Jersey law Festo was contractually bound to pay USI a commission based on the original agreement between Lab-Volt and USI. Baked within that analysis is whether there was a valid and enforceable agreement, the terms of the agreement, and whether any outside circumstances (such as illegality) defeat that agreement. Related to the first question before the Court, should USI fail to demonstrate that Festo breached any contract, the Court will consider whether USI is entitled to recovery under quasi-contractual theories of law such as unjust enrichment. *Second*, should USI prevail in meeting its burden of demonstrating that it is entitled to recovery under contract or quasi-contract law, the Court determines the appropriate amount of that recovery. *Third and finally*, the Court addresses the parties' peripheral issues, such as whether USI is entitled to attorneys' fees, punitive damages, costs, and interest. The Court marches through each question in turn.

### A. Was There a Binding Contract?

Under New Jersey law, a plaintiff must prove on a breach of contract claim that: (1) "the parties entered into a contract containing certain terms"; (2) the "plaintiff[] did what the contract required [it] to do"; (3) the "defendant[] did not do what the contract required [it] to do," i.e., breaching the contract; and (4) there was a loss stemming from the defendant's breach of contract.[23] *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021) (quoting *Globe Motor Co. v.*

---

[23] As discussed earlier, USI and Festo agree that New Jersey law applies. (*See* Pl.'s Post-Trial Br. 37; Def.'s Post-Trial Br. ¶ 329.)

*Igdalev*, 139 A.3d 57, 64 (N.J. 2016)). A routine contract is complete after there is an "offer, acceptance, consideration, and performance by both" sides. *Id.* (quoting *Shelton v. Restaurant.com, Inc.*, 70 A.3d 544, 556 (N.J. 2013)). There is a concreteness requirement such that the terms must be "sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty." *Id.* (internal quotations and citation omitted). Said differently, "[a] written contract is formed when there is a 'meeting of the minds' between the parties evidenced by a written offer and an unconditional, written acceptance." *Morton v. 4 Orchard Land Tr.*, 849 A.2d 164, 170 (N.J. 2004). It remains a question of law "[w]hether a contract is clear or ambiguous." *Fed Cetera, LLC v. Nat'l Credit Servs., Inc.*, 938 F.3d 466, 469 (3d Cir. 2019). Should a party prove all the requisite requirements, "[a] contract is an agreement resulting in obligation enforceable at law." *Goldfarb*, 245 A.3d at 577 (quoting *Borough of W. Caldwell v. Borough of Caldwell*, 138 A.2d 402, 410 (1958) (alteration in original)).

Starting from the beginning, the Court first determines whether there was an offer made by either USI or Lab-Volt.[24] It remains uncontested that Dr. Whitt spoke with Professor Self on the morning of April 3, 2012, at which point he learned of an expiring American funding opportunity to sell equipment to the Military College.[25] (Whitt Trial Tr. 78:19-21, 79:1-10.) Dr. Whitt then relayed this informed to Yahsi, and at some point, USI determined that it would recommend Lab-Volt as the supplier. (Yahsi Trial Tr. 132:20-25; *see also* Duggan Dep. Tr. 34:16-22; J. Ex. 137.) Yahsi called Duggan to relay the news of the Military College funding, explaining how Professor Self was looking for a supplier to utilize the U.S. funding and to ask whether Lab-Volt

---

[24] It is stipulated that Festo is "liable for the debts and obligations of Lab-Volt Inc." (Final Pretrial Order § 3, Stip. Facts ¶ 21.) The Court's reference to Lab-Volt in analyzing the law therefore applies in equal force to Festo.

[25] Dr. Whitt had an existing relationship with USI and acted as its agent on numerous occasions, including in April 2012 with respect to the Omani deal. (Whitt Trial Tr. 21:9-12, 55:11-20.)

was interested in working with USI on the project exclusively. (Yahsi Trial Tr. 135:23-25, 136:1-4.) Duggan, who conceded he was "very poor with dates" (Duggan Dep. Tr. 28:4), did not dispute that this call occurred and remembers Yahsi sending him a list of equipment associated with the possibility of the Omani military deal (*Id.* at 30:5-8). On an assessment of all facts, the Court finds that Yahsi, speaking on behalf of USI, made an offer to Duggan, representing Lab-Volt. This finding is further credited by the extensive course of dealings between the parties that mirrors offers such as this one and supports a finding that Yahsi made an offer on behalf of USI in such a manner. *Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 137 (3d Cir. 1993) ("The past dealings of contracting parties pursuant to an agreement are probative of the parties' intent."). The existence of an offer is equally supported by the events that unfolded after April 3, 2012, and the numerous admissions by Duggan that Lab-Volt owed a commission, suggesting that he was offered the Omani deal. (*E.g.*, Duggan Dep. Tr. 34:16-22.) To be sure, Festo does not contest that USI made a valid offer. (*See* Def.'s Post-Trial Br. ¶¶ 337-67.)

Moving next to acceptance, USI must prove that Lab-Volt intended to accept the offer through "words or conduct." *See Senior Settlements, LLC v. Growth Tr. Fund*, No. 05-777, 2008 WL 11383961, at *4 (D.N.J. Feb. 27, 2008). A party's intention is analyzed under an objective standard, meaning a "contracting party is bound by the apparent intention [it] outwardly manifests to the other contracting party." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 421 F. Supp. 2d 831, 834 (D.N.J. 2006) (citation omitted). To "constitute a contract[, the offer] must be in a form which is intended of itself to create legal relations on its acceptance." *Trs. of First Presbyterian Church in Newark v. Howard Co. Jewelers*, 97 A.2d 144, 146 (N.J. 1953). Here, the factual record supports that Duggan accepted Yahsi's offer on April 3, 2012, binding Lab-Volt. For starters, Yahsi testified that Duggan agreed to his offer to broker the Military College deal and to work exclusively with USI. (Yahsi Trial Tr. 133:3-7, 134:9-18.) This acceptance went beyond

verbal agreement: USI sent Duggan a list prepared by Professor Self of desired equipment and Duggan subsequently put together an equipment list for USI to send to the Omanis such that his conduct expressed an intent to accept the offer. *Senior Settlements*, 2008 WL 11383961, at *4 (citing N.J. Model Civil Instr. 4.10C). Duggan's sending of the invoices to Yahsi that included a twenty-five percent discount reflects his acceptance. (*See* J. Ex. 3.) And although Yahsi initially told Duggan that they "will put [their agreement] in writing" later, Duggan did memorialize the agreement on April 10, 2012, on Lab-Volt letterhead. (J. Ex. 50 (indicating that the Lab-Volt letter was "confirm[ing]" USI's twenty-five percent commission for the deal).) Duggan agrees that the letter memorializes the "[twenty-five] percent discount that Mr. Yahsi [was] entitled to." (Duggan Dep. Tr. 78:9-12.) Holistically examining the record, the Court finds that Duggan accepted USI's arrangement and had the requisite authority to bind Lab-Volt.[26] Festo does not meaningfully contest this element, either. (*See* Def.'s Post-Trial Br. ¶¶ 337-67.)

Baked within the idea of an offer and acceptance is that the parties must have a meeting of the minds and, with that, a mutual understanding of the terms. *See Gordon v. Dailey*, No. 14-7495, 2018 WL 1509080, at *8 n.6 (D.N.J. Mar. 27, 2018) (finding, in accordance with the New Jersey Model Jury Instructions, that an acceptance must match the terms of the offer and not be premised on different terms). In addition, an agreement that is too vague is not enforceable. *Baer v. Chase*, 392 F.3d 609, 619 (3d Cir. 2004). Putting it all together, "[a]n agreement so deficient in the specification of its essential terms that the performance by each party cannot be ascertained with reasonable certainty is not a contract, and clearly is not an enforceable one." *Lo Bosco v. Kure*

---

[26] Although occurring after-the-fact, Lab-Volt and Festo's numerous communications to USI that it intended to honor its commission agreement strongly indicates that Festo believed it accepted the agreement.

*Eng'g Ltd.*, 891 F. Supp. 1020, 1025 (D.N.J. 1995) (citing *Malaker Corp. S'holders Protective Comm. v. First Jersey Nat'l Bank*, 395 A.2d 222, 227 (N.J. Super. Ct. 1978)).

Festo launches a frontal assault on the definiteness requirement, contending that because the parties largely disagree on what compensation would be appropriate should there be a contract, the price term was too vague. (Def.'s Post-Trial Br. ¶¶ 337-49.) The question becomes: does USI's litigation position that it is owed forty-percent of the equipment and Festo's position that, at best, USI is owed twenty-five percent commission for the equipment mean the contract was never formed? The Court finds that it does not. First, as Festo aptly highlights, USI did not present evidence of any writing or communication from Festo that reflected it would compensate USI a twenty-five percent commission plus a markup of everything over the original list price. (*Id.* at 93 ("Plaintiff can point to no offer from Lab-Volt for the two part compensation (25% commission plus 100% of markup). Plaintiff pointed to no communication between the parties concerning compensation until the April 10, 2012, letter, which clearly says nothing about a markup component of compensation.").) Instead, all documented evidence supports the position that USI was to be paid twenty-five percent of the equipment: (1) the original invoice Duggan sent Yahsi had a twenty-five percent discount listed (J. Exs. 3, 4), (2) the April 10 written agreement listed the same (J. Ex. 50), (3) every internal communication Festo had about its potential obligation to USI listed the twenty-five percent number (*e.g.,* J. Ex. 2), as did (4) USI's original demand letter dated August 31, 2015 (Def.'s Ex. Q at 1 ("Despite the successful award of the [Omani] contract, originally sourced by USI, and repeated assurances that Lab-Volt (and Festo) would honor the agreement to pay 25% of the contract amount to USI, USI has received no compensation . . . .")). USI's post-2015 litigation position that it is owed more than the twenty-five percent commission cannot serve to retroactively render the terms of the contract ambiguous, particularly when only Yahsi's testimony supports that a markup was part of the original agreement. (Yahsi Trial Tr.

127-32.) Festo agrees, too, that this additional markup claim was "introduced [by USI] without evidence as a litigation tactic." (Def.'s Post-Trial Br. ¶ 288.) "The mere presence of a disagreement over the precise amount owed does not undermine the fact that the contract[] [was] in place and breached by Defendant." *Universal Atl. Sys., Inc., v. Bos. Mkt. Corp.*, No. 20-5291, 2022 WL 13829825, at *8 (E.D. Pa. Oct. 21, 2022). Equally true is that Lab-Volt's after-the-fact communication to USI that Lab-Volt will "see how much commission [it] can get for [USI]" for the Military College project cannot turn back the clock to undermine what was already a valid contract.[27] (J. Ex. 29.) Even after Duggan expressed concerns about whether Lab-Volt could hold up its half of the agreement with USI, Duggan continued to recognize that his April 10, 2012 letter agreement represented a "commitment to USI." (J. Ex. 14.) In no uncertain terms, that "commitment" was a twenty-five percent commission. Thus, the Court finds that in April 2012 the parties were on the same page as far as commission.

More to this point, if at some time during the relevant events USI believed it was entitled to a markup over the final list price, the Court finds that this belief occurred before April 10, 2012, when USI contemplated purchasing the equipment from Lab-Volt directly through Lab-Volt Europe and selling it to the Omanis. (J. Ex. 1 at 1 (Yahsi informing Duggan he was "thinking to use L[ab]-V[olt] Europe").) After all, Duggan's initial proforma listed USI as the "customer," supporting that the parties contemplated Lab-Volt selling the equipment to Lab-Volt Europe directly. (J. Ex. 3A.) Should this transaction structure have taken place, USI would have been free

---

[27] The Court finds that this is not a case where Festo's performance "has become literally impossible" to perform or "inordinately more difficult" after the sale became an FMS. *Capparelli v. Lopatin*, 212 A.3d 979, 993-94 (N.J. Super. Ct. App. Div. 2019). Festo does not raise the doctrine of impossibility or impracticability of performance but does imply that these concepts undermine whether the parties agreed to the amount of commission. (Def.'s Post-Trial Br. 91.) But nothing prevents Festo from paying USI out of its own profits from the Omani project and, therefore, Duggan's post-April 10, 2012, representation that he is unable to pay the agreed upon twenty-five percent does nothing to retroactively undermine the parties' agreement.

to charge the Omanis whatever it wished and keep all markup above the list price. (Yahsi Trial Tr. 131:9-16 (testifying that in the past USI would sometimes purchase equipment from Lab-Volt directly to sell to the customer).) But as memorialized in the April 10 agreement, the transaction became a "direct order to Lab-Volt," and the terms were cemented as twenty-five percent of the equipment price.[28] Thus, the Court finds that the April 10, 2012 letter agreement memorializes in sufficiently concrete terms that the parties agreed to exclusivity, commission price, type of transaction (direct order), and special terms (no tender), providing an adequate foundation for a binding contract.

Consideration in this matter is fairly straightforward. Under New Jersey law, consideration is something of value, meaning a benefit to one party or loss of benefit to another party. *See Bernetich, Hatzell & Pascu, LLC v. Med. Recs. Online, Inc.*, 136 A.3d 955, 961 (N.J. Super. Ct. App. Div. 2016) (Consideration "is a bargained-for exchange of promises or performance that may consist of an act, a forbearance, or the creation, modification, or destruction of a legal relation.") (internal citations omitted). Simply put, each party "must 'get something' out of the exchange." *Id.* (citing *Cont'l Bank of Pa. v. Barclay Riding Acad., Inc.*, 459 A.2d 1163, 1171 (N.J. 1983)). Here, USI would receive a twenty-five percent commission for using its agent (Dr. Whitt) and connections (Professor Self) to act as an agent for Lab-Volt and secure a deal for the sale of over $9 million in equipment and other services to the Omanis through funding from the U.S. Government. Lab-Volt would benefit by the sale of over $9 million in equipment and other services

---

[28] In further support of this finding, on April 19, 2012, Duggan sent Yahsi an e-mail communication that reflected Duggan was unaware that the proforma invoice sent to Professor Self earlier that week had "prices raised another 25%." (J. Ex. 25 at 2 (USI0002053).) Yahsi responded that he "didn't raise" the prices above the list price. (*Id.* at 1 (USI0002052).) Yahsi goes on to mention "our 25," presumably discussing the set twenty-five percent commission. (*Id.*) On a holistic review of all the evidence in the case, the Court finds that the evidence points to the conclusion that the parties agreed to a twenty-five percent commission in April 2012.

to the Omanis through funding from the U.S. Government and in return provide USI with a commission. Both parties, therefore, received "a benefit" from the promisor, as Lab-Volt's longstanding business relationship with USI demonstrates that it valued USI's services and paid USI through commissions. *Cont'l Bank of Pa.*, 459 A.2d at 1172. The Court therefore finds adequate consideration.

In sum, the Court finds that USI made an offer, Lab-Volt accepted, both parties understood the material terms of the contract, and both parties offered valuable consideration. Having found a valid contract, the Court moves next to whether one party failed to perform under the contract—i.e., a breach—and whether any of Festo's defenses warrant a finding that it is not liable under the contract.

### B.      Was There a Breach of Contract?

Finding a valid contract, the next question becomes whether both parties performed in accordance with that contract. As detailed above, USI's role was to broker the deal between Professor Self (representing the Military College) and Lab-Volt. Dr. Whitt was first presented with the opportunity to use the expiring U.S. Government funding and worked with USI to act as a liaison between Professor Self and Lab-Volt to establish the equipment list and secure Lab-Volt's role in the transaction. (Pl.'s Ex. 36; Whitt Trial Tr. 32:18-25, 33:1-4, 34:3-24.) USI provided Professor Self with the pricing, answers to questions, and ultimately submitted the proposal for approval after modifying the proforma invoice. (Pl.'s Ex. 43.) USI timely sent the offer to Professor Self (J. Ex. 133), and that offer was ultimately accepted. As promised by USI, there was no tender and Lab-Volt received the project sole source. (J. Ex. 2.) Moreover, Lab-Volt eventually closed the deal to sell equipment to the Military College and made a direct sale. (*Id.*) Thus, USI performed its part of the bargain.

On the flip side, little ink need be spilled on Festo's performance under the contract. The U.S. Government paid Festo $11,099,361. (Final Pretrial Order § 3, Stip. Facts ¶ 66.) Of that payment, $9,585,569 was for actual equipment. (Abbott Trial Tr. 427:3-25, 428:1-23; *see also* J. Ex. 42.) USI demanded payment from Festo for the Military College project, but Festo did not provide any compensation to USI and retained all proceeds. (Final Pretrial Order § 3, Stip. Facts ¶¶ 67-69.) Therefore, the Court finds that Festo breached the contract.

In rebuttal, Festo argues that there cannot be any breach of the contract because if there was any agreement, it was subject to conditions precedent that were not met. (Def.'s Post-Trial Br. 96 (citing *Stang v. Hack*, No. 13- 05085, 2016 WL 4680153, at *4 (D.N.J. Sept. 7, 2016)).) Absent USI complying with the conditions, Festo avers, there can be no valid breach of contract claim. *Id.* at 97 (citing *Chemtech Int'l, Inc. v. Chem. Injection Techs., Inc.*, 247 F. App'x 403, 405-06 (3d Cir. 2007)). Here, Festo highlights two failed conditions precedent within the April 10, 2012 letter agreement—"[t]he eventual transaction at issue neither [(1)] involved offset funds nor [(2)] was a direct order from the Omani [Military College] to Lab-Volt." (*Id.* at 97-98.) Thus, according to Festo, the April 10 agreement "went unfulfilled" and thus "there can be no claim for breach of th[e] agreement." (*Id.* at 98.)

The Court disagrees with Festo's conditions precedent argument. For one, the Court reads "direct order" as stated in the April 10, 2012 letter agreement to represent that Lab-Volt will be directly selling the equipment, not USI. (J. Ex. 2.) The Court therefore rejects Festo's argument that direct order meant the Omanis must purchase the equipment and not the U.S. Government for the Military College's benefit. (Def.'s Post-Trial Br. 97-98.) Bolstering this finding is the mountain of evidence that demonstrates USI and Dr. Whitt, as early as April 2012, were aware that it was an expiring U.S. Government credit. Next, Festo ignores that the original contract between USI and Lab-Volt occurred on April 3, 2012, when Yahsi offered to bring the Omani project to Duggan,

and Duggan accepted. (Yahsi Trial Tr. 131:24-25, 132:1-17, 133:3-7, 134:9-18.) At that time, USI prepared an equipment list on behalf of Lab-Volt, arranged with Professor Self to win the project for Lab-Volt, and sent the proforma invoice that ultimately was accepted by the U.S. Government. The April 10, 2012 letter agreement only served to memorialize the parties' arrangement. Does the change from offset funding to FMS (should there be a difference) mean that USI did not fulfill the condition precedent? The Court answers that question in the negative. Semantics aside, USI promised to act as an agent to secure Lab-Volt the Omani deal. That is precisely what USI did in April 2012. (J. Ex. 66 (Duggan thanking Yahsi for "invit[ing] [Duggan] to participate in [the Omani] opportunity").) The Court does not find that the agreement between USI and Festo was a "conditional contract" based exclusively on whether it was an offset deal, as Festo argues. In any event, from April 3, 2012, USI, Dr. Whitt, and Duggan were all aware that the U.S. Government was funding the Omani Military College deal. No confusion existed between the parties as to where the money for the transaction originated. The simple fact that Festo believes that the structure of the deal changed when it engaged in the FMS procedure for two-plus years is of no consequence. USI promised Lab-Volt a sole-source deal to directly sell equipment and services to the Omani Military College with monetary credit from the U.S. Government. (J. Ex. 2.) USI delivered on that promise. The Court therefore disagrees that USI failed to fill conditions precedent.

In a last-ditch effort to defeat USI's breach of contract claim, Festo argues that the contract was illegal because Festo is unable to pay contingent fees in connection with the Military College sale. (Def.'s Post-Trial Br. 98-99 (citing 10 U.S.C. § 2306(b); 41 U.S.C. §§ 254(a), 3901(b); 48 C.F.R. § 252.225-7027)).) Should the contract be illegal, the Court agrees it is typically unenforceable. *Design-4 v. Masen Mountainside Inn, Inc.*, 372 A.2d 640, 642 (N.J. Super. Ct. App. Div. 1977) ("Generally the law will not assist either party to an illegal contract; the law leaves the parties where it finds them."). But here, Festo fails to prove that it may not pay USI its fee. As one

representative for the U.S. Government in this case noted, "Festo is not precluded from paying the fees, [it] just can't be reimbursed through [Government] funds."[29] (Pl.'s Ex. 109.) As Festo explained in its letter to the U.S. Government, "there do not appear to be any cases, administrative decisions, rulings or other guidance that offer assistance in interpreting [the regulations]" on whether Festo may pay USI. (Pl.'s Ex. 115; *see also* Orozco Dep. Tr. 71:2-4 (noting that it is not for the U.S. Government to advise Festo whether it could pay part of its profits to USI).) The U.S. Government accepted Festo's offer on its equipment (with a five-year warranty) as being fair and reasonable. (Abbott Trial Tr. 424:22-25, 425:1-4.) If Lab-Volt intended to discount its normal equipment price to pay USI in 2012, cutting into its own profit margin on the equipment, Festo failed to meet its burden in showing that payment is illegal outside of attempting to merely list some of the statutes and regulations that govern FMS. *Naimo v. La Fianza*, 369 A.2d 987, 992-93 (N.J. Super. Ct. Ch. Div. 1976) (noting that a party may raise as a defense illegality); *Falotico v. Parvez*, No. A-2106-19, 2022 WL 402442, at *7 (N.J. Super. Ct. App. Div. Feb. 10, 2022) (noting that a party raising a defense to a breach of contract claim has the burden of proving such a defense). Simply put, Festo determined in 2015 (with the advice of "its attorneys") that it was allowed to pay USI out of its own pocket and merely could not be reimbursed by the U.S. Government for that payment. (Pl.'s Ex. 115.) Festo may want to change its tune now to serve its litigation position, but it fails to provide specific reasons as to why its original position was incorrect.

### C.      Would USI Also Prevail Under an Unjust Enrichment Theory?

---

[29] To be sure, another U.S. Government agent, Duncan Butts, expressed concern over contingent fees being unallowable. (Pl.'s Ex. 109.) But it isn't clear whether Festo paying USI its fee was the source of his concern or if rather, he was concerned with Festo "attempt[ing] to bring the U.S. Government into the privilege of sharing the cost of unallowable contingent fees." (*Id.*)

Under New Jersey law, a party may succeed in proving an unjust enrichment claim on a judicial finding that there was no express contract providing for renumeration if they show "that [a] defendant received a benefit and that retention of that benefit without payment would be unjust." *Am. Rubber & Metal Hose Co. v. Strahman Valves, Inc.*, No. 11-1279, 2011 WL 3022243, at *8 (D.N.J. July 22, 2011) (quoting *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994)). That is, "the plaintiff performed services in good faith . . . the defendant accepted those services, and . . . the plaintiff had a reasonable expectation of compensation." *Merlo v. Fed. Express Corp.*, No. 07-4311, 2010 WL 2326577, at *7 (D.N.J. June 7, 2010) (citation omitted). The touchstone of the analysis is whether a plaintiff can establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they were rendered, (3) an expectation of compensation therefor[e], and (4) the reasonable value of the services." *Read v. Profeta*, 397 F. Supp. 3d 597, 643 (D.N.J. 2019) (citations omitted).

To be sure, the Court finds a valid and enforceable contract between Festo and USI, rendering USI's claim for unjust enrichment null. But even if the contract was not enforceable, the Court finds USI proved a valid unjust enrichment claim. For the reasons stated above, USI acted as an agent to secure Lab-Volt the Omani Military College deal. In good faith and in accordance with their decades-long business practice, USI acted as an agent on behalf of Lab-Volt when Professor Self offered the opportunity to utilize expiring U.S. Funds. Duggan accepted and acknowledged verbally and in writing that USI would be Lab-Volt's exclusive agent. No doubt exists that USI expected to be compensated, as evidenced by prior business dealings and the April 10, 2012 letter agreement memorializing a twenty-five percent commission. Finally, Duggan testified that, routinely, Lab-Volt would pay USI or other agents a twenty-five percent discount on its equipment to account for a commission to that agent. (Duggan Dep. Tr. 22:3-17.) Yahsi recalled the same practice was established over Lab-Volt and USI's long lasting business arrangement.

(Yahsi Trial Tr. 128:22-25, 129:1-15.) Thus, the parties themselves established a reasonable value for USI's services. The Court finds all elements of unjust enrichment under New Jersey law are met here.

In an attempt to undermine this finding, Festo argues that (1) Lieutenant Colonel Robert Hoffman ("Colonel Hoffman") testified that Lab-Volt was responsible for securing the equipment order to the Omani Military Project, (2) USI did minimal work to secure the project, and (3) USI failed to show a market rate for USI's services.[30] As noted above, USI and Lab-Volt established the market rate after years of doing business together. Festo also misses the mark in emphasizing how little time USI spent in securing the Omani deal for Lab-Volt. (Def.'s Post-Trial Br. 102.) Historically, USI acted as an agent to find deals for Lab-Volt and utilized its connections and resources to secure exclusive opportunities on Lab-Volt's behalf. (Yahsi Trial Tr. 172:6-17 (explaining that USI pays numerous people to learn of exclusive opportunities).) At any point, Lab-Volt could have chosen to stop doing business with USI if it felt that USI was putting in "minimal" efforts in return for a twenty-five percent commission. (Def.'s Post-Trial Br. 102.) But Lab-Volt likely understood that agents work on commission and that information and opportunities are an essential part of the business. (*E.g.*, Duggan Dep. Tr. 22:7-17 (explaining that Lab-Volt wanted its seventy-five percent of the list price and if an agent would bring a customer to Lab-Volt, it would pay the agent the twenty-five percent discount).) Finally, the sole testimony of Colonel Hoffman that the Omanis wanted Lab-Volt equipment is unavailing. (Def.'s Post-Trial Br. 31 (citing Hoffman Dep. Tr. 17, 58-59).) Colonel Hoffman's e-mail communication relaying the Omanis' message was sent on April 17, 2012, more than a week after Dr. Whitt sent Professor Self

---

[30] Colonel Hoffman was an "army program chief" for the U.S. Government. (Hoffman Dep. Tr. 16:7-19.) He was stationed in Oman from 2011 until 2013 and became involved in the Omani Military College transaction after the process started. (Hoffman Dep. Tr. 17:2-25.)

the Lab-Volt invoice within the deadline (J. Ex. 133) and a week after Yahsi, Duggan, Dr. Whitt, Professor Self, and representatives of the Omani Ministry sat down for a celebratory dinner after USI submitted Lab-Volt's proposal to the U.S. Embassy (Whitt Trial Tr. 63:14-25, 64:1-18; Yahsi Trial Tr. 178:2-23). Thus, Colonel Hoffman was not involved when USI and Dr. Whitt submitted the initial offer, and his e-mail communication does little to undermine the fact that USI first brokered the deal.

Thus, although the Court found a valid contract between the parties, even if it did not, the Court finds that USI would prevail under an unjust enrichment theory. The end result is the same.

### D.      What is USI's Recovery?

Having found a valid contract between USI and Lab-Volt, and a subsequent breach by Festo, the Court next determines the compensation that USI is owed. As illustrated at length above, the Court finds that the parties agreed to a twenty-five percent commission for USI on the price of the equipment. The Court starts with addressing USI's contention that it is owed any markup over Lab-Volt's list price.

*First and foremost*, in strong support of the twenty-five-percent numerical figure is the April 10, 2012 letter agreement drafted by Yahsi. *Karl's Sales & Serv., Inc. v. Gimbel Bros.*, 592 A.2d 647, 650 (N.J. Super. Ct. App. Div. 1991) ("[A] contractual provision should generally be construed narrowly against its drafter . . . [but] the construction should be sensible and in conformity with the expressed intent of the parties." (internal quotations and citation omitted)). The Court fails to see why the April 10 letter agreement would memorialize all terms except for the alleged markup provision USI believes was part of the contract.

*Second*, USI's 2015 demand letter sought out a twenty-five percent commission without ever mentioning the markup provision. (Def.'s Ex. Q ("Despite the successful award of the [Omani] contract . . . [and] repeated assurances that Lab-Volt (and Festo) would honor the

agreement to pay 25% of the contract amount to USI, USI has received no compensation . . . .").)

That is, USI did not demand a forty-percent commission until USI filed an Amended Complaint

in June 2018 (Am. Compl. ¶ 11, ECF No. 35).

*Third*, outside of Yahsi's testimony of what he and Duggan purportedly understood in April

2012, little to no evidence exists that the parties agreed to the additional markup. In email

communications between Yahsi and Duggan, Yahsi denied raising the prices above the list price

and mentioned only "our 25," presumably meaning USI's twenty-five percent discount. (J. Ex.

25.) Indeed, in all of Festo's internal communications and communications to USI, only the

twenty-five percent commission was mentioned, further supporting that the parties were synched

on price when entering the agreement. (Pl.'s Ex. 121 (Duggan noting USI's "Finders Fee" of

twenty-five percent of the equipment price), J. Ex. 20 (Duggan informing others at Festo that the

contract award "still includes the 25%" normally paid to agents), J. Ex. 10 (proforma indicating a

"25% Commission [to] USI").) One would think that USI would correct Lab-Volt's mistake if it

believed it was entitled to an additional markup, but it did not. Thus, since the primary evidence

offered to support the markup comes from Yahsi and his testimony about course-of-dealings with

Lab-Volt, the Court determines that the additional markup was not part of the Omani agreement.[31]

Nor can prior course of dealings substitute unambiguous contract terms such as the memorialized

twenty-five percent provision. *Armkel, LLC v. Pfizer Inc.*, No. 02-4206, 2005 WL 2416982, at *13

(D.N.J. Sept. 29, 2005) (noting that prior course of dealing is "only relevant" when a contract term

is ambiguous).

---

[31] The Court finds that if Lab-Volt Europe (owned by Yahsi) directly purchased the equipment to sell to the Omani Military College, it could have charged any additional markup it desired. But ultimately Lab-Volt agreed to a direct sale to the Omanis and the markup provision, if it ever existed, fell wayside before the agreement was finalized. (J. Ex. 2.)

Finding that the parties agreed to a twenty-five percent commission for USI, little doubt exists that this commission is only paid on the final equipment price. The original proformas sent by Duggan to USI in early April 2012 listed the twenty-five percent commission only for the equipment and not for installation or training. (*E.g.*, J. Ex. 3.) The April 10, 2012 letter agreement also associates the twenty-five percent commission to "the equipment" if it is purchased at Lab-Volt's list price. (J. Ex. 2.) Yahsi testified to the same: that commission was not paid on warranties, installation, training, or shipping. (Yahsi Trial Tr. 283:13-15.) Indeed, USI contends that the five-year warranty promised by Festo to the Omanis was an attempt to reduce USI's fee because USI knew that it would not receive any commission on non-equipment items. (*Id.* at 312:13-24; Pl.'s Post-Trial Br. 72.) Thus, the Court calculates the twenty-five percent fee only on the equipment price.

In briefly addressing the supposedly "sham" warranty, as USI characterizes it, the Court finds the change from a one-year warranty to a five-year warranty is of no consequence in its calculations. No matter the origin of the enhanced warranty, it was memorialized in the final Letter of Acceptance between Festo and the Omani Military College.[32] Festo is therefore bound to honor the warranty. For several years, Festo maintained personnel onsite at the Military College to perform Festo's promised services within the agreement. The U.S. Government ultimately believed the Omanis wanted a five-year warranty and factored that understanding into its determination that Lab-Volt's equipment was listed at a fair and reasonable price. (Gifford Dep. Tr. 47:5-21.) Because the extended warranty ended up in the final contract, the motivation Lab-Volt had in offering it is immaterial.

---

[32] In the FMS program, "a Letter of Acceptance is a government-to-government agreement that identifies the defense articles and services the United States Government proposes to sell to the other country to meet the requirements identified in that other country's Letter of Request." (Final Pretrial Order § 3, Stip. Facts ¶ 50.)

The final question before the Court is which equipment list should be considered in calculating the twenty-five percent commission. Does the commission apply to the April 2012 equipment list USI (vis-à-vis Dr. Whitt) sent to Professor Self ($8,766,299.50) or the final contract equipment list set in October 2014 ($9,585,569)?[33] The Court applies it to the latter. As set out in the April 10, 2012 letter agreement, USI is entitled to twenty-five percent of the equipment price. Nothing in the agreement or the parties' previous dealings suggest that this number is stagnant based on the precise equipment included in the original 2012 proforma. (*See* J. Ex. 3.) It strains credulity to contend that if Professor Self requested entirely different equipment not found on the original list, then USI would be entitled to nothing. Moreover, Yahsi testified that the exclusivity provision would apply to the "project as a whole," meaning USI's role was to obtain the project for Lab-Volt and its commission was based on the final price. (Yahsi Trial Tr. 268:21-25.)

That said, the Court declines to award USI any commission based on its speculation that Festo received additional projects related to Oman. (Yahsi Trial Tr. 268:10-19.) As the plaintiff in this action, USI has the burden of proving its damages. *Cromartie v. Carteret Sav. & Loan*, 649 A.2d 76, 84 (N.J. Super. Ct. App. Div. 1994) ("A party claiming damages for breach of contract has the burden of showing that the breach caused loss or prevented gain."). Yahsi's "belief" that Festo obtained additional contracts based on what he "heard" is far from sufficient evidence to warrant an additional award. Even if true, the evidence supports that USI is entitled only to a commission for the Military College project and not for every future contract between Festo and the Omanis. (J. Ex. 2.) Nor will the Court award USI any commission premised on what it believes to be sham warranties. The warranties exist no matter the motivation behind them, and USI is

---

[33] As the Court found above in its fact-finding capacity, the U.S. Government's final offer for the equipment alone was $9,585,569. (Abbott Trial Tr. 427:20-25, 428:1.) This number excludes any extended warranties, service portions of the final agreement, and miscellaneous items—all items excluded from USI's entitled commission.

simply not entitled to commission from such warranties. The Court will therefore contain USI's commission to twenty-five percent of the October 2014 final equipment price, full stop. By the Court's calculation, that totals $2,396,392.25. (*See also* Def.'s Post-Trial Br. 86 ("If any credit for post-April 2012 events is to be given to USI, its compensation for the Omani MTC transaction should then be limited at a maximum to 25% of the price of equipment sold pursuant to the final October 2014 contract, or $9,585,569 x 0.25 = $2,396,392.25.").)[34]

With USI's base recovery calculated, the Court next addresses pre- and post-judgment interest, attorneys' fees, and punitive damages.

### 1.    Interest on USI's Recovery

USI seeks pre- and post-judgment interest on its recovery in this action. (Pl.'s Post-Trial Br. 86.) The Court has considerable discretion in awarding prejudgment interest, as well as discretion in how such interest should be calculated. *Litton Indus., Inc. v. IMO Indus., Inc.*, 982 A.2d 420, 430 (N.J. 2009). The goal in awarding interest would be to make the plaintiff whole by "cover[ing] the value of the sum awarded for the prejudgment period during which the defendant had the benefit of monies to which the plaintiff is found to have been earlier entitled." *Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am.*, 323 A.2d 495, 512 (N.J. 1974) (citations omitted). A defendant's bad faith in litigating the suit is not a prerequisite to awarding prejudgment interest. *Id.* In a breach of contract case, prejudgment interest is "based on equitable principles." *Litton*

---

[34] To be clear, the equipment line item in the final contract award is listed at $10,414,569. (J. Ex. 57.) But as the U.S. Government "awarded it," and as the evidence in this case demonstrates, the equipment line represented $9,585,569 of actual equipment costs; $800,000 for the extended service portion of the warranty; and $30,000 for installation. (Abbott Trial Tr. 427:8-25, 428:1-23; *see also* J. Ex. 42 (U.S. Government calculating "$200,000/year" for years two to five for "ongoing full-time service" as part of the equipment line item), Ex. 57.) USI is only entitled to a commission for the actual equipment cost and not the full-time service or installation.

*Indus.*, 982 A.2d at 430 (quoting *Cnty. of Essex v. First Union Nat'l Bank*, 891 A.2d 600, 608 (N.J. 2006)).

Having found USI entitled to compensation in this matter, the Court finds prejudgment interest is warranted here. The Court further finds that prejudgment interest should likely be paid from the date that the U.S. Government paid Festo for the equipment and not the final warranty payment years later, as Festo suggests. (Def.'s Post-Trial Br. 111.) As detailed in the Court's order issued with this Opinion, the parties shall separately brief their positions on pre- and post-judgment interest.

### 2.      Punitive Damages

USI separately seeks punitive damages for Festo's allegedly "malicious conduct and conduct in willful disregard" of USI's rights. (Pl.'s Post-Trial Br. 81-83.) Punitive damages are generally disfavored on breach of contract claims under New Jersey law. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1194 (3d Cir. 1993). "[P]unitive damages are available to punish [a defendant's] aggravated misconduct and to deter similar misconduct in the future." *Id.* at 1192 (second alteration in original) (internal quotations omitted). Such additional damages may be appropriate if the "defendant commits a tort or violates a special relationship of trust between the parties," but the award of punitive damages typically attaches to "the commission of the tort or the breach of trust, 'rather than the breach of contract.'" *Est. of Bloom v. Bank One Corp.*, No. 03-6108, 2006 WL 8457135, at *5 (D.N.J. Feb. 17, 2006) (quoting *Lighting Lube, Inc.*, 4 F.3d at 1194).

Here, the Court declines to award punitive damages. USI merely proffers that Festo disregarded USI's contractual rights to a commission and breached the parties' agreement. (Pl.'s Post-Trial Br. 61-65, 83.) USI also alludes to misconduct, perhaps highlighting that it believes Duggan sent it a false proforma invoice in June 2012 to mislead USI. (*Id.* at 65.) In any event, the

Court already tossed USI's fraud claim because "it has not identified a freestanding legal duty that goes beyond the performance of the contract." *USI Int'l, Inc v. Festo Didactic, Inc.*, No. 15-8451, 2022 WL 345086, at \*4 (D.N.J. Feb. 4, 2022). The Court finds no evidence that Festo litigated in bad faith, abused the judicial process, or engaged in malfeasance during the course of the litigation. As such, the Court finds punitive damages are inappropriate for a routine breach of contract claim.

### 3.  Attorneys' Fees

Finally, USI contends that it is entitled to attorneys' fees because of Festo's "bad faith." (Pl.'s Post-Trial Br. 83.) But it is settled law that "the traditional American rule ordinarily disfavors the allowance of attorneys' fees in the absence of statutory or contractual authorization." *Hall v. Cole*, 412 U.S. 1, 4 (1973). New Jersey law, too, "generally disfavors the shifting of attorneys' fees" unless "expressly provided for by statute, court rule, or contract." *Packard-Bamberger & Co. v. Collier*, 771 A.2d 1194, 1202 (N.J. 2001) (citations omitted). That said, the Court may award attorneys' fees "when the interest of justice so require." *Hall*, 412 U.S. at 5.

The Court finds no persuasive reason to award attorneys' fees here. It is undisputed that no statute, court rule, or provision in the parties' agreement provides for attorneys' fees to the prevailing party. Nor is this a case where Festo acted "in bad faith, vexatiously, wantonly, or for oppressive reasons" during the litigation. *Hall*, 412 U.S. at 5 (quoting 6 J. Moore, Federal Practice 54.77(2), p. 1709 (2d. ed. 1972)). At no point did Festo run afoul of Court orders, abuse the discovery process, or engage in any unsavory conduct. Instead, USI points only to prelitigation events and postures that Festo's "only" defense at trial was that the change from an offset transaction to an FMS transaction undermined the validity of the parties' contract. The latter argument is simply not true. Festo also argued that the contract was unenforceable because the payment of a commission was illegal, the terms of the contract were undefined and vague, and that there was never a meeting of the minds between Lab-Volt and USI. (*See generally* Def.'s

Post-Trial Br.) The Court also endured a multi-day trial in which Festo put forward these defenses and provided some evidence in favor of its litigation position despite ultimately falling short. Further, Festo's prelitigation conduct did not rise to a level that would overcome the general presumption disfavoring attorneys' fee awards. The Court outlined its position above as to the extended warranty, allegedly fake proforma invoice, and Festo's communications with the U.S. Government. Simply put, nothing occurred in this case that is egregious or malicious enough to warrant attorneys' fees. So, the Court declines to grant any.

## V.      **CONCLUSION**

For the above reasons, the Court concludes that USI prevails on its breach of contract claim. An order consistent with this Opinion will be entered.

/s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE